CLAY B. BROWN AND DOROTHY E. BROWN, ET AL.,[1] PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 83795–83800. Filed December 19, 1961.

*William H. Kinsey, Esq.*, and *James R. Moore, Esq.*, for the petitioners.*

*Norman H. McNeil, Esq.*, and *Aaron S. Resnick, Esq.*, for the respondent.

SCOTT, *Judge:* Respondent determined deficiencies in petitioners' income taxes for the years and in the amounts as follows:

[1] Proceedings of the following petitioners are consolidated herewith: Donald L. Brown and Ingrid R. Brown, Docket No. 83796; Charles William Booth and Nancy H. Booth, Docket No. 83797; Donald Lee Brown, Docket No. 83798; Philip F. Brown, Docket No. 83799; and Marilyn Brown, Docket No. 83800.

*Brief *amicus curiae* was filed by Arthur A. Armstrong as attorney for the West Los Angeles Institute for Cancer Research.

| Docket No. | Petitioner | Taxable year | Deficiency |
|---|---|---|---|
| 83795 | Clay B. Brown and Dorothy E. Brown | 1953 | $2,732.62 |
| | | 1954 | 5,073.80 |
| | | 1955 | 50,779.14 |
| 83796 | Donald L. Brown and Ingrid R. Brown | 1954 | 2,080.04 |
| | | 1955 | 16,621.28 |
| | | 1956 | 5,815.76 |
| 83797 | Charles William Booth and Nancy H. Booth | 1953 | 79.74 |
| | | 1954 | 231.66 |
| | | 1955 | 2,005.41 |
| | | 1956 | 840.97 |
| 83798 | Donald Lee Brown | 1953 | 1,445.28 |
| 83799 | Philip F. Brown | 1953 | 260.00 |
| | | 1954 | 1,042.61 |
| | | 1955 | 18,462.71 |
| | | 1956 | 6,639.80 |
| 83800 | Marilyn Brown | 1953 | 260.00 |
| | | 1954 | 1,003.39 |
| | | 1955 | 18,465.66 |
| | | 1956 | 6,590.81 |

The principal issue for decision is whether the gain realized by petitioners upon the disposition of their stock in Clay Brown & Company is long-term capital gain from the sale of such stock as reported by petitioners or ordinary income from a transaction which does not come within the provisions of section 117(a) of the Internal Revenue Code of 1939, and section 1222(3) of the Internal Revenue Code of 1954 as determined by respondent.

Respondent contends, in the alternative, that should it be decided that the disposition was a sale resulting in long-term capital gain, a part of the amounts received by petitioners in each of the years here involved was in payment of interest and taxable to petitioners as interest income under section 22(a) of the Internal Revenue Code of 1939 and section 61(a) of the Internal Revenue Code of 1954.

### FINDINGS OF FACT.

Petitioners Clay B. Brown and Dorothy E. Brown are husband and wife residing in Portland, Oregon. They filed joint Federal income tax returns for the years 1953, 1954, and 1955 with the district director of internal revenue for the district of Oregon.

Petitioners Donald L. Brown and Ingrid R. Brown are husband and wife now residing in Portland, Oregon. They filed joint Federal income tax returns for the years 1954, 1955, and 1956 with the district director of internal revenue at San Francisco, California. For the calendar year 1953 petitioner Donald L. Brown filed a separate Federal income tax return with the district director of internal revenue at San Francisco, California.

Petitioners Charles William Booth and Nancy H. Booth are husband and wife residing in Milwaukie, Oregon. They filed joint Federal income tax returns for the years 1953, 1954, 1955, and 1956 with the district director of internal revenue for the district of Oregon.

Petitioner Philip F. Brown and petitioner Marilyn Brown, who reside in Portland, Oregon, each filed a separate income tax return for each of the years 1953, 1954, 1955, and 1956 with the district director of internal revenue for the district of Oregon.

Petitioner Clay B. Brown (hereinafter sometimes referred to as petitioner) has for many years been engaged in the lumber business as an executive of various lumber concerns. He is the father of Donald L., Philip F., and Marilyn Brown.

Clay Brown & Company (hereinafter sometimes referred to as the corporation) was incorporated under the laws of the State of Oregon on September 28, 1946, and until its dissolution on February 4, 1953, was qualified to do business in California. The corporation had authorized capital stock of 50,000 shares, par value $1 per share. Thirty-two thousand shares were issued and outstanding as follows:

| Name | Date acquired | Number of shares | Cost | Official title in Clay Brown & Co. |
|---|---|---|---|---|
| Clay B. Brown | 9/30/46 | 6,000 | $6,000 | President. |
| Dorothy E. Brown | 9/30/46 | 6,000 | 6,000 | None. |
| Donald L. Brown | 9/30/46 | 6,000 | 6,000 | Ass't vice president. |
| Philip F. Brown | 9/30/46 | 6,000 | 6,000 | None. |
| Marilyn Brown | 9/30/46 | 6,000 | 6,000 | None |
| Charles W. Booth | 12/50 | 1,000 | 7,993 | Secretary-treasurer |
| Nancy H. Booth | 4/52 | 500 | 4,000 | None |
| C. A. Hill | | 500 | | Vice president |

From the date of its incorporation through 1949, the corporation was engaged in the business of selling forest products at wholesale. In 1949 the corporation acquired millsite property at Fortuna, California, and constructed thereon a gang mill and planing mill with substantially all new equipment. The gang mill and planing mill were put into operation during February 1950. In the spring of 1951 the corporation completed an additional unit consisting of a circular sawmill which was converted into a band sawmill during the fall of 1951. The gang mill, of a Swedish design, was the first of its type in California. The gang mill lent itself to the utilization of the small timber in the area, and permitted the conversion into merchantable lumber of timber previously ringed and permitted to die by ranchers in the clearing of grazing land. The output of the gang mill, planing mill, and band sawmill was sold through the sales and executive offices of the corporation maintained in the United States National Bank Building, Portland, Oregon. The corporation also maintained a sales office in San Francisco.

Balance sheets of the corporation contained in its income tax return for the fiscal year ended April 30, 1952, and a financial statement

for January 31, 1953, set forth assets, liabilities, and stockholders' equity on the indicated dates as follows:

| | Apr. 30, 1952 | Jan. 31, 1953 |
|---|---|---|
| **ASSETS** | | |
| Cash | $13,457.87 | $30,738.41 |
| Receivables (less reserve for bad debts) | 135,076.99 | 117,332.76 |
| Inventories | 156,765.18 | 458,112.44 |
| Capital assets (less reserve for depreciation) | 567,282.16 | 521,280.79 |
| Timber (less depletion) | 75,603.55 | 47,549.78 |
| Land | 24,635.27 | 24,635.27 |
| Miscellaneous | 19,700.04 | 10,983.11 |
| | 992,521.06 | 1,210,632.56 |
| **LIABILITIES** | | |
| Accounts payable | 95,833.90 | 32,263.30 |
| Bonds, notes, mortgages | 320,417.29 | 529,407.60 |
| Accrued expenses | 38,432.77 | 28,114.05 |
| State and Federal income tax | 140,055.00 | 126,389.98 |
| Capital stock | 32,000.00 | 32,000.00 |
| Paid-in or capital surplus | 13,986.00 | 13,986.00 |
| Earned surplus | 351,796.10 | 448,471.63 |
| | 992,521.06 | 1,210,632.56 |

The California Institute for Cancer Research (hereinafter referred to as the institute) was formed under the name of the "Cancer Research Foundation of California" on April 26, 1945, as a nonprofit, nonstock corporation under the provisions of division 1, part 4, title 12, article 1 of the California Civil Code for such scientific, charitable, and educational purposes as are set forth in its articles of incorporation. The institute is an adjunct of the University of California at Los Angeles. On August 25, 1947, its name was changed to California Institute for Cancer Research. On February 25, 1957, the name was changed to West Los Angeles Institute for Cancer Research.

The institute was a tax-exempt organization under the Federal Tax laws at the time the transaction here involved was entered into.

None of the petitioners were founders of the institute, or had any connection with or interest in the institute, except that derived from the transaction hereinafter described. Petitioner never had heard of the institute before he was approached by its representative as hereinafter mentioned.

During the summer of 1952, William B. Boone of the Portland, Oregon, office of Dean Witter & Co., investment counselors and brokers, was informed that his Los Angeles office was in touch with a prospective client interested in acquiring or buying small companies. Boone inquired of a number of people including petitioner as to any possible interest in selling. When contacted by Boone, petitioner stated that he was not particularly interested or looking for a sale or for a buyer, but that he would sell if the price was right, to which Boone replied that he had nothing definite in mind, but might come up with something. On August 8, 1952, Boone relayed the Clay

Brown & Company prospect to his Los Angeles office and was informed that the parties thought to be interested were not interested. Subsequently, Boone's Los Angeles office informed him that the institute might be interested in acquiring Clay Brown & Company. Louis H. Seagrave, who was then chairman of the board of directors of the institute, came to Portland and conferred with Boone and attempted to meet petitioner who was out of town. Boone then expedited a meeting between Seagrave and petitioner.

Boone received from Seagrave certain circulars or brochures. These circulars or brochures were prepared by Seagrave in consultation with a Beverly Hills attorney. This attorney, now dead, had worked out sales of businesses to Loyola University under arrangements similar to the suggestions in these brochures. Boone compared the qualifications of Clay Brown & Company to those set forth in the brochures, found the company to qualify, and discussed the substance of the brochures with petitioners.

The brochures explained the benefits to the sellers of selling their stock to the institute and in broad outline set out how the sale would be effectuated. The benefits of persons selling to the institute were stated therein as follows:

1. They can sell their business to the Institute for more than they can sell for cash, for payment over a period of years, frequently with a substantial down payment.

2. They continue to control the business operation and to draw their regular salary, and retain an interest in the profits as well, until they are ready to retire.

3. They pay only a long term capital gains tax (25% federal).

4. They protect their families from estate, inheritance and final income taxes, which, with their chief assets still invested in the company, would have been ruinous.

5. They avoid the perplexing predicament of either paying prohibitively high personal taxes on distributed corporate earnings, or risking heavy penalties under section 102 for unreasonable accumulation of surplus if earnings are not distributed.

6. They eliminate the risk that after the death of owners, the business may be subjected to a forced sale or liquidated at possible disastrous loss to their families.

7. They avoid the risk of the business being ruined by incompetent management if sold to others for payment on an installment basis, before the owners have been paid in full.

The sale itself was outlined in the brochures generally as follows: All of the stock is sold to the institute at an agreed price. The institute gives its note for the purchase price. The corporation is then liquidated and an agreed amount of cash out of the liquidated assets is paid to the sellers as a downpayment. A real estate trust deed and a blanket chattel mortgage covering the fixed assets of the dissolved corporation are deposited with the sellers as security for the unpaid

institute note. A new operating company is formed with nominal capital, and this new company enters into a 5-year lease agreement with the institute covering all the fixed assets of the old corporation, and agrees to pay an annual rental therefor of an amount equal to 80 percent of the new company's net earnings before taxes. The operating company also acquires the current assets and assumes the current liabilities, and gives its note to the institute for the amount of the net current assets which note the institute will, in turn, deposit as additional security with the sellers. The note from the operating company will be subordinated to reasonable bank loans to the operating company. The institute will pay to the sellers annual amounts equal to 90 percent of all rentals received on its lease of assets to the operating company.

In addition the brochures contained the following observations about the sale transaction: The sellers, as a group, may own a minority interest in the operating company, but none of the sellers may be directors or corporate officers of the operating company. In this case, petitioner, being president of the old corporation, would be employed by the operating company as its general manager at a salary comparable to his old salary, and the other key personnel could carry over from the old corporation to the operating company. The operating company may be controlled by any of the sellers' trusted associates such as lawyers, accountants, etc. Due to internal revenue laws, the lease arrangement with the operating company may not exceed 5 years. However, a new lease may be entered into with another company, with other owners, officers, and directors, in which the present sellers can likewise own a minority interest. The sale by the sellers to the institute and the agreement on the lease between the institute and the operating company must be at complete arm's length with no overlapping of officers or directors. Under the arrangement, the rental income received by the institute is tax exempt. Also, if not more than 30 percent is paid to the sellers on the note in the first year, the transaction qualifies as an installment sale, and the taxes on the long-term capital gain resulting are due only in installments proportionate to the amounts paid on the note in any one year.

Boone wrote a letter dated November 28, 1952, to Seagrave in which he:

(1) Related his contacting of petitioner and enclosed financial statements of Clay Brown & Company, together with a photograph of the Clay Brown & Company plant.

(2) Invited Seagrave to visit the plantsite at Fortuna, California, meet with petitioner, and inspect the property.

(3) Relayed petitioner's offer of 32,000 shares at $40 per share ($1,280,000) with a cash downpayment or, in the alternative, without a downpayment, $45 per share ($1,440,000).

Seagrave went to Eureka, California, where petitioner met him at the airport and took him to the mill, and over the area in general to inspect the type of timber grown in the region. Seagrave spent 1½ or 2 days looking over the property and then returned to Los Angeles.

During the early part of the negotiations petitioner received advice of counsel concerning the tax consequences of the proposed sale, such advice being set forth in an 11-page memorandum to petitioner from the law firm representing him. In the memorandum the tax-exempt status of the institute and the deductibility of the rent by the lessee corporation, as well as the long-term capital gains qualification of the amounts received by the shareholders of Clay Brown & Company, were covered. It was therein stated that "The more the deal is a straight sale of the stock of Clay Brown & Company by you, the better your tax position," and the fact that the amounts received by the sellers will be derived from and limited to existing corporate assets and future corporate earnings is not inconsistent with a bona fide sale of the stock. However, petitioner was warned not to acquire an interest in the operating corporation other than that necessary to secure the unpaid balance of the purchase price for the stock. In this respect it was suggested that petitioner have a management contract with the operating corporation to run only for the duration of the payout period and that this contract not be tied in as a definite condition in the sale of the stock. It was further stated that "the feature which makes the proposal of the institute possible is the fact that the new corporation will be able to deduct the rental payments paid the institute but yet such rental payments will be exempt from taxation when received by the institute," because other than for this feature the transaction could just as easily be consummated with any third party instead of the institute. It was suggested since the tax-exempt status of the institute was an integral part of the transaction that petitioner make sure a definite ruling from the Treasury Department has been or will be obtained in this regard.

The ensuing negotiations between Seagrave and petitioner encompassed the following:

(a) A letter, dated December 17, 1952, from Seagrave to petitioner, which stated in part:

Our difficulty is the price, or to put it another way, we feel that a $250,000 premium over reconstructed values is perhaps all a purchase will stand, especially since average earnings before taxes of $360,000 would be required to pay off a price of $1,300,000. Earnings of $360,000 per annum are a little higher than your own idea of $350,000. Incidentally, earnings before taxes for the two and one-half years to October 31, 1952, averaged about $300,000 per annum, but if we were to add back to the year ended April 30, 1952 the amount of $150,000, which would probably not be far from the amounts charged to expense for items which could have been capitalized, and assume net earnings for the current year would aggregate $350,000, the three-year average would be about $350,000.

On the other hand, there is another angle not to be overlooked, namely, the prospective earnings of the new lessee company, in which stockholders of the present company could own nearly 50%. Assuming net before taxes of $350,000, earnings per annum of the new company after payment of rental would be $72,000. Assuming that income taxes for such an amount of earnings average 33⅓% the net to surplus would be $48,000 a year or $240,000 for the five year period. The net equity accruing to the 49% interest in the new lessee company would amount to $117,000 additional. This would increase the total proceeds of the sale to $1,417,000, which is the equivalent of $44.28 a share.

(b) By another letter dated December 17, 1952, Seagrave requested a pro forma balance sheet for Clay Brown & Company for October 31, 1952, substituting values that Seagrave and petitioner had discussed and also requested a copy of the complete audited statement for April 30, 1952. The audited statement was sent to Seagrave on December 22, 1952.

(c) By letter dated December 23, 1952, Booth sent to Seagrave the requested pro forma balance sheet for Clay Brown & Company as of October 31, 1952, wherein the statement of assets was brought up to date and adjusted values for the assets were substituted in place of book values and certain expense items were capitalized. The total adjusted value for the corporate assets shown on the pro forma balance sheet was $1,825,032. The total liabilities at this time were approximately $769,000, which figure had been previously conveyed to Seagrave, resulting in a net worth of approximately $1,050,000 for October 31, 1952. The corporate liabilities mentioned above included $125,000 in notes owed by the corporation to petitioner and his wife.

(d) The appraised values used for the pro forma balance sheet, to which the above-mentioned adjustments were made, were taken from an appraisal made by the General Appraisal Company dated July 21, 1951, which appraisal was supplied to the institute. The appraisal set forth the following asset values:

| New replacement | Depreciated | Insurable |
|---|---|---|
| $760,545.44 | $650,447.10 | $556,764.49 |

The "new replacement" value, as adjusted, was the one utilized in arriving at the $1,050,000 net worth mentioned above. In a letter dated January 7, 1953, Seagrave requested the appraisal be brought up to date and such was accomplished 1 week later by the General Appraisal Company. The supplemental appraisal, based on the original appraisal for insurance purposes, set forth the following asset values:

| New replacement | Depreciated | Insurable |
|---|---|---|
| $836,759.43 | $703,523.88 | $585,636.62 |

Seagrave met with petitioner in Portland for negotiations which lasted several days. The principal point of discussion was the price. The price ranged from the initial asking price of about $1,500,000 which included the two notes payable to petitioner and his wife in the

total amount of $125,000 down to the $1,300,000 including the $125,000 of notes, which was eventually agreed to. At no time during the discussions between petitioner and representatives of the institute concerning the price of the stock was any mention made of interest on the deferred payment or an increase in the purchase price in lieu of interest. Both parties considered the amount to be paid for the stock in excess of the reconstructed net worth of the corporation in terms of going concern value and earnings record. At one point in the negotiations Boone felt that the whole deal was going to fall through.

Minutes of meetings of the institute's board of directors reflect the following details, among others, regarding the prospective transaction with the selling shareholder:

(a) The minutes of January 6, 1953, relate that the chairman (Seagrave) read a summary of the situation affecting Clay Brown & Company, and that after Seagrave obtained additional information, supplemental statistics, and documentary data, he would present these to the institute's committee on industrial investments. The summary referred to above, among other things, states:

16. Assets as appraised by General Appraisal Co., July 1951, with adjustments for items since capitalized, expensed or not included in appraisal, result in net worth of $1,049,877. To this can be added $15,000 of equipment to be transferred to company making total of $1,064,877. Six percent interest on deferred balances, assuming an average of $360,000 earnings per annum would total $237,112.

| | |
|---|---:|
| Total worth | $1, 064, 877 |
| Interest | 237, 112 |
| | $1, 301, 989 |

The interest on deferred balances was computed as follows:

| | | 6% |
|---|---:|---:|
| Price | $1, 300, 000 | $78, 000 |
| 1st year payment | 259, 200 | |
| Balance | $1, 040, 800 | $65, 080 |
| 2d year payment | 259, 200 | |
| Balance | $781, 600 | $46, 896 |
| 3d year payment | 259, 200 | |
| Balance | $522, 400 | $31, 344 |
| 4th year payment | 259, 200 | |
| Balance | $263, 200 | $15, 792 |
| 5th year payment | 263, 200 | |
| | —0— | $237, 112 |

(b) The minutes of January 27, 1953, set forth a resolution which appointed a legal committee to go over a proposed purchase agreement and lease and license agreement, both documents being integral parts of the transaction with petitioners, and make any revisions they felt to be to the best interests of the institute and to pass

and approve other documents in connection with the proposed purchase. There were further resolutions authorizing the president and secretary to execute the purchase agreement and the lease and license agreement as they had been outlined subject to changes made with the approval of the legal committee. Attached to the minutes of January 27, 1953, were the following:

(1) A statement by Seagrave that petitioner had advised him as follows:

He advised me that the new lessee California corporation to be known as Fortuna Sawmills, Inc., would have initial paid in capital of $25,000, but that it had an authorized capital of $50,000, and that an additional $25,000 would be paid in, if found necessary.

He also stated that he was a signer personally on the mortgage, and that he would also be a personal signer on the new mortgage to the U.S. National Bank, which would be for approximately $101,000, to which it had now been paid down. He hopes to arrange this mortgage on a five year basis, which would make the annual service of it about $23,000, and have the effect of increasing the net current assets by $80,000. If the bank does not make that arrangement, he feels sure that the bank will make it a three-year loan, on which the annual service would be about $38,000, as it has been.

Mr. Brown advises that he has been assured by the U.S. National Bank that it will continue to lend on logs and lumber, as in the past, with a line up to $400,000.

Mr. Brown read me a memo detailing the working funds they could rely on, which I have reduced to a memorandum, attached hereto. He says that he is in a position to provide funds, or to lend his personal credit to insure adequate funds. He thinks the working capital position will not be as much of a problem as it has been in the past.

(2) An earnings summary of Clay Brown & Company as follows:

1. Company began sawmill operation May 1, 1950.
2. Net before taxes:

| | | |
|---|---|---|
| Year ended April 30, 1951 | $415,533 | |
| Year ended April 30, 1952 | 145,078 | (nearly $70,000 expenses) |
| Six months to Oct. 31, 1952 | 207,567 | |
| | $768,000 | |
| Average annual earnings before taxes | 307,270 | |

Capital items expensed during 2½ years:

| | | |
|---|---|---|
| Supplies & Tools on hand | $25,000 | |
| Other items | 33,000 | |
| Labor and const. lumber | 40,000 | |
| | $98,000 | |
| Average annual | | $32,500 |
| Total average annual earnings | | $339,000 |

(3) Statements by Seagrave as follows:

15. Earnings of an average of $360,000 would pay out purchase price in five years.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

17. Clay Brown has a good reputation in Portland, Oregon, and generally throughout the lumber and plywood industry. Mr. Carvel Linden of the U.S. National Bank, Portland, stated to me January 14, 1953: "Clay Brown is a top operator. His situation is clean. I have advised him, solely because of his tax burden, to sell to you if he could come to terms with you. We think that his achievement in starting this lumber company, and producing and selling profitably the first month, and 26,400,000 ft. the first year at a net profit before taxes of $415,553 is a real achievement."

The institute had approximately two dozen proposed business acquisitions brought to its attention by various brokers in Los Angeles and the institute selected two, Clay Brown & Company being one of them. The primary motivation of the institute in purchasing the stock of Clay Brown & Company was the prospect of ending up with the assets free and clear after the purchase price had been fully paid, which would then permit the institute to convert the property into money for use in cancer research. The officers of the institute felt that the purchase price would be paid off in 5 years.

On January 17, 1953, one of petitioner's attorneys sent a letter to the institute's legal adviser which stated as follows:

Enclosed is our draft of a proposal to the Institute. We understand that the purchase price will be determined in the near future. As noted in the proposal, it desired to liquidate Clay Brown & Co. and start operations with the lessee corporation by February 1, 1953.

It may now be in order for the Institute to make inquiry of us as to the availability of the operating lessee corporation. We will be able to furnish such a corporation, which will be a California corporation called "Fortuna Saw Mills, Inc." Such inquiry may be addressed to Fortuna Saw Mills, Inc., c/o Calvin N. Souther, 1001 Board of Trade Building, Portland 4, Oregon.

By letter dated January 24, 1953, petitioner made a proposal to sell the Clay Brown & Company stock to the institute for a determined price and set out a procedure whereby the entire transaction could be consummated. The board of directors of the institute decided to decline petitioner's proposal and instead, as mentioned above, set about to finalize its own draft of a purchase agreement and lease and license agreement, both of which had been prepared by its attorney in consultation with Seagrave. A final draft of the purchase agreement was approved by the institute's legal committee appointed under the resolution adopted at the January 27, 1953, directors meeting.

Under date of February 4, 1953, the purchase agreement, approved by the institute's legal committee, was executed by the institute as buyer and petitioner, representing himself and the other stockholders,

as seller. The agreement provided for the sale of the 32,000 shares of the Clay Brown & Company stock and two promissory notes owned by petitioner and his wife in the total amount of $125,000 for a price of $1,300,000, represented by a nonnegotiable note in that amount. The agreement provided generally as follows: A balance sheet for Clay Brown & Company will be made as of January 31, 1953, and the seller agrees to indemnify the institute against any loss arising out of any liability not set out in the balance sheet except that liabilities for income and excess profits taxes and contract renegotiations in excess of the reserves therefor on the balance sheet are not included in the seller's agreement of indemnity but that any such excess liabilities will serve to reduce the principal amount of the note. The institute will liquidate Clay Brown & Company and shall pay the seller $5,000 in cash, execute a lease and license agreement with Fortuna Saw Mills, Inc. (hereinafter referred to as Fortuna), and sell all the remaining assets, other than the leased assets and the $5,000 cash, to Fortuna subject to all the liabilities of Clay Brown & Company other than the $125,000 of notes for an amount equal to the net amount of the assets transferred. Fortuna, in turn, is to assume the above-mentioned liabilities and execute its note to the institute in payment for the assets. As security for the note given the seller, the institute will execute and deliver to the seller a real estate mortgage or deed of trust and a chattel mortgage covering the real and personal property received by the institute upon the liquidation other than assets sold to the lessee, as well as after-acquired property. The institute will also assign its rights under the lease and license agreement with the lessee and the purchase note executed by the lessee to the seller and will further make a defeasible assignment of all patents, patent applications, and trademarks to the seller. The institute is to pay the seller 90 percent of the royalties and rents received in cash by the institute from its lessee, Fortuna, or any successor lessee under the lease until the note is paid in full. However, the institute will be obligated to make payment on the principal note only out of the 90 percent of the rents and royalties it receives from its lessee. If not sooner paid in full, the promissory note will be due and payable January 31, 1963. The unpaid balance of the note shall bear no interest before maturity but thereafter shall bear interest at the rate of 5 percent per year. In the event the institute shall fail to pay the seller a total of $250,000 during any 2 consecutive years of the lease, the seller shall have the right to declare the entire unpaid balance due. In the event of any default by the institute the seller may proceed to enforce payment of the unpaid balance against the collateral held by seller as security, and only against such collateral. No sale by the institute of any assets received on the dissolution of Clay

Brown & Company, other than those assets sold to Fortuna, will be effected without the prior consent of the seller.

Pursuant to the purchase agreement, the institute issued a non-negotiable, non-interest-bearing note for $1,300,000 payable to the sellers ($125,000 for the notes owned by petitioner and his wife and $1,175,000 for the stock). Also, as contemplated in the transaction: A deed of trust, chattel mortgage, and general assignment of intangibles were executed by the institute under date of February 4, 1953.

The stock record book of Clay Brown & Company reflects the cancellation of all issued certificates for shares of stock as of February 4, 1953, the issuance of a new certificate in the amount of 32,000 shares to the California Institute for Cancer Research, Certificate No. 18, dated February 4, 1953, which certificate bears the following typed legend: "Cancelled March 14, 1953 upon complete liquidation of the corporation pursuant to resolutions adopted by stockholders and directors on February 4, 1953" and the endorsement dated March 13, 1953, of the California Institute for Cancer Research as follows: "Certificate being returned for cancellation."

Also under date of February 4, 1953, petitioner and the other three directors and officers of Clay Brown & Company resigned and directors associated with the institute were elected. Formal documents looking to the dissolution of Clay Brown & Company were executed by the directors representing the institute. Among the various documents prepared for this purpose were resolutions by Clay Brown & Company to dissolve, adoption of the dissolution resolution by the institute, a grant deed from Clay Brown & Company, Bill of Sale and Assignment for personalty, and a general assignment from Clay Brown & Company to the institute covering cash, receivables, inventory, etc. Resolutions dissolving the company were filed, title report changed, and United States Treasury Department forms filed.

Under date of February 4, 1953, the institute recorded the following entries reflecting the transaction:

Entry recording purchase of stock:

| | | |
|---|---|---|
| Investment in stock of Clay Brown & Co | $1,175,000 | |
| Notes receivable—Clay Brown & Co | 125,000 | |
| Notes payable re Fortuna Sawmills, Inc | | $1,300,000 |

To record purchase of all of issued and outstanding stock of Clay Brown & Co. (32,000 shares) together with two promissory notes owned by Clay and Dorothy E. Brown and executed by Clay Brown & Co.

Entry recording liquidation:

| | |
|---|---|
| Current assets transferred to operating company | $617,115.72 |
| Investment in fixed assets | 780,969.88 |
| Investment in timber | 15,008.32 |
| Investment in timber purchase contract | 104,991.68 |

Excess of cost over appraisal value of assets
    leased to Fortuna Sawmills, Inc_____    $373, 038. 33
Deposits_____      51. 00
    Current liabilities transferred to operating company_____    $499, 563. 64
    Long-term debt transferred to operating company_____    91, 611. 29
    Notes payable, stockholders_____    125, 000. 00
    Investment in stock of Clay Brown & Co_____    1, 175, 000. 00
To record receipt of assets and assumption of liabilities upon
    liquidation of Clay Brown & Co. as of 2/4/53.

During the negotiations with Seagrave prior to execution of the purchase agreement, it was known that an operating company was to be formed, without any decision having been made as to who would form such company. Actual formation of the operating company was considered at a meeting in Portland, Oregon, in December 1952, attended by petitioner, Seagrave, Charles W. Booth, secretary-treasurer of Clay Brown & Company, and Calvin N. Souther, attorney for petitioner and Clay Brown & Company. At this meeting Seagrave was asked if the institute wanted to provide an operating company or had any suggestions in that respect. Seagrave had no suggestion. When petitioner was asked if he had someone in mind, he turned to Souther and inquired whether Souther would be willing to supply the operating company, Souther being familiar with the area in general through his representation of petitioner in connection with Humboldt Plywood Corporation, a prior business venture of petitioner in the same coastal region of northern California. At that time or sometime thereafter Souther acceded to petitioner's offer.

Fortuna was formed as a California corporation on January 26, 1953, with authorized capital stock of 2,500 shares, par value $10 per share. All of these shares were issued and outstanding, and were owned 2,000 shares by Souther and 500 shares by Kinsey. The officers and directors of Fortuna were:

    Calvin N. Souther, President and director.
    Raymond P. Underwood,[1] Vice president and director.
    William H. Kinsey, Secretary and director.

[1] Underwood is a member of the same legal firm as Souther and Kinsey.

Souther paid into Fortuna $25,000 for all of its stock. The 500 shares owned by Kinsey were subsequently purchased by him from Souther. The $25,000 paid by Souther into Fortuna was out of his own personal funds and was not obtained directly or indirectly from petitioner or any of the other Clay Brown & Company stockholders. Neither petitioner nor any of the other selling shareholders owned any stock interest in Fortuna.

Upon receipt of the Clay Brown & Company assets, subject to the liabilities, as liquidating distributions, the institute did the following:

    (a) Paid $5,000 cash upon the principal note.

(b) Executed a 5-year lease and license agreement with Fortuna.

(c) Sold to Fortuna all the current assets received by the institute upon liquidation of Clay Brown & Company, except the $5,000 in cash mentioned in subparagraph (a) above, which assets were transferred to Fortuna under a general assignment dated February 4, 1953.

(d) Obtained an assumption agreement from Fortuna dated February 4, 1953, whereunder Fortuna assumed the liabilities of Clay Brown & Company (except the Brown notes in the amount of $125,000) and wherein Fortuna agreed to pay the institute an amount equal to the excess of the assets received over the liabilities assumed. Such excess was determined by the audit of Clay Brown & Company as of January 31, 1953, made pursuant to the purchase agreement. The excess subsequently determined by the audit was evidenced by the promissory note of Fortuna dated May 15, 1953, in the amount of $20,991.79.

The 5-year lease and license agreement between the institute and Fortuna required Fortuna to pay to the institute in rent and royalties an amount each year equal to 80 percent of the net profits resulting from the use and occupancy of the demised premises. The agreement additionally provided in general as follows: The net profits were defined as profits before depreciation and income, franchise, excess profits, or other similar Federal or State taxes. Lessee shall compute net profits for each semiannual period and should a loss result from operations during any semiannual period, any subsequent profits may be applied to offset such loss. Lessor may at its option cancel the lease in the event the lessee shall not have paid lessor a total of $277,778 as rental and royalties during any two consecutive full annual periods. Lessee shall exert its best efforts to cause the demised premises to be productive of the highest possible net profits consistent with good business judgment but the rentals shall accrue only in the event that net profits are earned through the operation of the demised premises. Lessee alone shall bear any and all losses incurred by it in the operation of the business. Lessee shall maintain the demised premises in a good state of repairs, shall pay all general property taxes levied against the premises, and keep the premises adequately insured. The lease contract will not be assigned by lessee without the consent of the lessor. During the term of this lease the majority of the voting stock of lessee must be held only by such persons as are approved by lessor. Lessor is the owner of the name and goodwill of Clay Brown & Company and lessee is given the right to use that name in the conduct of its business during the term of this lease. Until the principal note in the amount of $1,300,000 payable to the former shareholders of Clay Brown & Company has been paid in full, this lease shall not be amended without the consent of petitioner.

Lessee agrees to enter into an agreement with petitioner whereby petitioner shall be employed as general manager of lessee until the expiration or sooner termination of the lease.

Pursuant to the lease and license agreement, resolutions were adopted by Fortuna's board of directors authorizing employment of petitioner and other key Clay Brown & Company personnel. Under date of February 4, 1953, petitioner executed a written employment agreement designating him as general manager of Fortuna for a term of 5 years at an annual salary of $25,000 and restricting him from activity competing with the business. Other key Clay Brown & Company personnel also remained at their jobs. No personnel from the institute were employed by Fortuna.

Approval, satisfaction, and execution of the voluminous set of documents by the various advisers and parties lasted several weeks beyond the stipulated date of the transaction. Near the end of the task, on February 21, 1953, petitioner's attorney wrote to the legal adviser of the institute with respect to a proposal by the institute to amend the deed of trust and chattel mortgage by deleting a requirement that the institute shall keep the subject property in a good state of repair, fully insured, and pay all taxes, etc. Petitioner's attorney stated that the usual deed of trust and chattel mortgage includes the above-mentioned provisions and that such obligations are the primary obligation of the mortgagor (the institute) even though such obligations are assumed by the mortgagor's lessee (Fortuna). He further stated as follows:

It is the intent of the selling stockholders that such provision in the deed of trust and the chattel mortgage will not be personally enforced against the Institute but will only be used as constituting a default triggering a foreclosure of the security. Therefore if it would help matters if Clay Brown et al. gave a letter to this effect, this might be arranged.

If for any reason the lease to Fortuna Sawmills, Inc. should be terminated and the Institute should not be able to immediately re-lease the properties, it is my understanding that the Institute would turn the properties back to the selling stockholders without the necessity of any foreclosure on the security. If this is the case then it would seem that the obligations contained in the subject provisions would never have any affect upon the Institute, because their only purpose is to trigger a default and as before stated the Institute plans to turn back the properties in any event so whether there is a default seems immaterial.

In short, this seems to be one of those situations where one party (Clay Brown et al) want a provision included on the theory it will not come into effect or create any obligation unless an unusual situation arises which the other party (the Institute) claims will never arise; while on the other hand the other party (the Institute) wants the provision deleted because it feels that there is no necessity for same. If the foregoing is a correct analysis of the situation we wish to suggest that there may be a reason of mutual interest to the Institute why the provisions should be included. For tax reasons we want the transaction to look as much as possible like an ordinary purchase of stock by the Institute and the leasing of the assets received upon liquidation to an

independent lessee. I believe the maintenance of this picture will be helped by the deed of trust and mortgage containing the standard provisions and might be hurt where the Institute transfers all of its obligations in respect to maintenance of the property to the lessee. We have done all we could to help the tax picture, such as not having Clay Brown own any stock in the lessee corporation, and we believe that inclusion of the provisions might have a beneficial effect in this same direction.

By letter dated February 26, 1953, the selling shareholders conveyed to the institute their assurance that they would not enforce against the institute personally its obligation to maintain the demised property but in case of such default the selling shareholders would only be entitled to proceed with foreclosure.

Neither petitioner nor any of his representatives ever sought to find out about the institute's financial condition at the time of the transaction. At that time the institute's financial resources fluctuated from nothing to $200,000 or $300,000 depending upon the demands of the university for research. The institute's funds are expended almost exclusively for cancer research, if not solely for such purpose.

The changeover from Clay Brown & Company to Fortuna was accomplished without any shutdown of the mills, disruption in production or the mechanics of operation. No changes were made in personnel below the level of directors and officers. The customary steps a new corporation takes in entering the business world were accomplished, i.e., bank accounts were set up, registration with the various agencies such as unemployment was changed, insurance policies were changed, the name on the door of the Portland office was changed, and the telephone listing amended. A whole new set of books was set up by Fortuna. A printed notice was sent to the trade relating the changeover from Clay Brown & Company to Fortuna. The stationery was changed by overprinting "Fortuna Sawmills, Inc. successor to" in the space above the "Clay Brown & Company" on the letterhead. Record keeping remained at the Portland executive office. The procedure now was for Fortuna to remit to the institute its check for 80 percent of the net profits as per the lease and license agreement and for the institute to remit its check for 90 percent of the amount received from Fortuna to the former shareholders of Clay Brown & Company as per the purchase agreement.

Fortuna harvested over 20 million feet from the timber interests assigned to it by the institute which the institute had received upon liquidation of Clay Brown & Company. This is substantially more than the 15 million feet estimated on the balance sheet showing adjusted values for assets as of October 31, 1952. Also, the amount per thousand feet used in determining adjusted values was $8.20 per thousand board feet whereas Clay Brown & Company had received an independent appraisal as of May 1, 1952, of $9 per thousand board feet.

The assets of Clay Brown & Company were subject to a mortgage to the United States National Bank of Portland, Oregon, in participation with the Reconstruction Finance Corporation. The bank and the RFC consented to the transfer of the property by Clay Brown & Company to the institute, and likewise consented to a lease of the assets by the institute to Fortuna in consideration for the assumption of the mortgage by Fortuna and petitioner's continuing personal guaranty of the debt.

Petitioner acted as general manager of Fortuna until he resigned effective October 31, 1954, to become the president of M and M Wood Working Company. Petitioner received a salary of $40,000 per year as president of M and M Wood Working Company. In his resignation petitioner waived his rights under the lease and license agreement to approve any successor to act as manager of Fortuna. Petitioner was retained by Fortuna in an advisory capacity at a salary of $1,000 per month and in such capacity he continued to watch over Fortuna's activities and continued to have the authority to sign corporate checks.

In the conduct of its operations Fortuna borrowed money from the United States National Bank of Portland, Oregon. There were 27 such loans from July 27, 1953, to May 13, 1957, ranging in amounts up to $55,214. One of the loans, for $50,000, was guaranteed personally by petitioner. The other 26 loans were secured by warehouse receipts or chattel mortgages on logs owned by Fortuna. The bank records disclose that the bank had a file designated "Fortuna Sawmills, Inc.," which was separate both from petitioner's personal file and the file for another one of petitioner's corporate enterprises.

Rev. Rul. 54–420, 1954–2 C.B. 128, was published in the fall of 1954, after Fortuna had been operating under the lease for more than 18 months. Petitioner's counsel brought this ruling to petitioner's attention by letter dated November 3, 1954, in which he recommended that the lease and license agreement between the institute and Fortuna be amended to eliminate the requirement of a management contract between Fortuna and petitioner and further that the rental paid by Fortuna to the institute be changed from 80 percent of the net profits to $5 per thousand board feet handled at the mill. It was stated that the $5 per thousand board feet rental would be a fair rental and that, based on the past operations of Fortuna, would produce a larger rent payment than the 80 percent.

In 1955 there was considerable flooding of the Eel River which is adjacent to Fortuna's millsite, causing considerable damage to the mill. At this time George Castera, president of the institute, contacted a high ranking Pentagon official with the hope of having the river repaired.

The sales prices of lumber began a steady decline in early 1956 without any corresponding decrease in costs. According to the com-

pany books Fortuna incurred a loss of $125,346.89 for the 6-month period November 1, 1956, through April 30, 1957. Market conditions worsened thereafter. The cause for the decline was in part due to a recession in the construction industry and also Fortuna was adversely affected by a change in the railroad rates for hauling freight. The fall in the lumber market in 1957 was not foreseeable in 1953 when the sale transaction between petitioner and the institute was consummated.

The mill operations at Fortuna were shut down and discontinued on or about June 19, 1957. Operations were never resumed by Fortuna, and in a letter dated December 6, 1957, Fortuna called the institute's attention to the expiration of the lease on January 31, 1958, and expressed a lack of desire on the part of Fortuna to negotiate a new lease. The institute was notified that the carrying charges of the shutdown property amounted to $3,200 a month which would no longer be the obligation of Fortuna after expiration of the lease on January 31, 1958. In the letter dated December 6, 1957, it was stated that as of the termination of the lease there would be certain items of prepaid insurance and taxes respecting the assets to be turned back over to the institute for which Fortuna claimed reimbursement and it was suggested that such reimbursement could be made by way of deductions from the face amount of the $20,991.79 note which had been executed by Fortuna to the institute.

Under date of December 12, 1957, petitioner notified the institute that he was instructing Souther that any payments made by Fortuna on the note in the face amount of $20,991.79 which had been assigned to him as additional security were to be paid directly to him. By letter dated January 10, 1958, petitioner made claim against Fortuna on behalf of himself and the other selling shareholders for the full amount of the note undiminished by any charges or claims which Fortuna might have against the institute. In reply to this claim Fortuna on January 31, 1958, remitted a check to petitioner in the amount of $17,304.92, being the face amount of the note reduced by the above-mentioned items claimed by Fortuna against the institute totaling $3,686.87. Fortuna took the position that the note represented a debt owed by Fortuna to the institute, with petitioner's interest being only for security and therefore any claims Fortuna had against the institute could be charged to the note. The payment by Fortuna was made subject to the condition that if it were determined that the institute owed Fortuna another amount, relating to a claim for overpayment of rent by Fortuna to the institute, Fortuna could take satisfaction out of the present payment to petitioner.

Also in the aforementioned letter dated December 12, 1957, petitioner notified the institute that a default existed under the mortgage,

and that unless the institute could give some definite assurance prior to February 1, 1958, that it would be able to re-lease the premises or otherwise dispose of them in a satisfactory manner, petitioner would have no alternative but to foreclose the mortgage.

In a letter dated January 17, 1958, addressed jointly to petitioner and Fortuna, the institute denied the existence of a default, and asserted an additional rental claim against Fortuna of $94,888.38 for the 6-month period May 1, 1956, through October 31, 1956. The institute took the position that Fortuna's earnings for the 6-month period ended October 31, 1956, generated rental of $94,888.38 notwithstanding the fact that losses incurred by Fortuna in the second half of the year ended April 30, 1957, resulted in a net loss for the whole year. The letter stated in part as follows:

It is our understanding that in the temporary withholding of rent due us for the six month period ending October 31, 1956, based upon profit for that period, Fortuna Sawmills, Inc. was acting with the consent of Mr. Clay Brown, such that this procedure would not be used by Mr. Brown or the other sellers to create a default under the terms of our purchase agreement with them dated February 4, 1953. Consequently, we are not aware of any present default under the purchase agreement.

Fortuna answered the institute's additional rental claim in a letter dated January 29, 1958, wherein Fortuna denied the liability and claimed an overpayment of rental in the amount of $55,948.36, for the full lease term. Fortuna took the position that the rental due the institute was to be determined from profits computed on a cumulative basis over the term of the whole lease and that on this basis it had overpaid its rent to the institute in the amount of $55,948.36.

Petitioner answered the institute's letter of January 17, 1958, in a letter dated January 30, 1958, wherein petitioner disagreed both with the institute's claim for additional rental, and with Fortuna's claim of overpayment. Petitioner informed the institute that if it should be determined that Fortuna actually overpaid the rent so that the institute was required to reimburse Fortuna, the institute should not look to the sellers of the stock of Clay Brown & Company for return of any of the purchase price. As for the institute's denial of a default, petitioner stated as follows:

Whether a default presently exists under the mortgage should be immaterial by the end of this month since at that time there will definitely be a default under Paragraph VII of the purchase agreement, and also under the provisions of the mortgage obligating you to keep the property insured, etc., if you fail to comply with such obligations on and after February 1, 1958. A default is pertinent only in regard to foreclosure, and I would much rather receive the remaining balance of the purchase price than foreclose on the property. If you are able to suggest any alternative to foreclosure I will be happy to consider same. It is necessary that we all recognize the realities of the situation since some definite decision will have to be made and action taken immediately.

The selling shareholders and the institute settled their differences by agreement made on June 3, 1958, as of February 1, 1958, providing for the retention of ownership and possession of the property by the institute with an obligation to pay upon the principal note 90 percent of any net proceeds realized from rental or sale of the property. The agreement provided in addition generally as follows: The sellers are required to pay all sums necessary to care for, maintain, and preserve the property including taxes. The 10 percent of the net proceeds of any lease or sale of the property will be payable to the institute notwithstanding the fact that the face amount of the principal note, in the amount of $1,300,000 has not been paid. The agreement will extend to December 31, 1958, and thereafter unless the sellers give notice of termination. Upon a written notice of termination the agreement will remain in effect for a reasonable period beyond the designated termination date if on such date there is pending a negotiation or proceeding for condemnation of the property or if the institute is engaged in negotiating a sale of the property upon terms satisfactory to the sellers to permit a conclusion of such proceedings or negotiations. In any event the institute will be allowed a reasonable time beyond the stated termination date to effect a forced sale of the property at public auction. During 1958 the institute leased the properties for a short period to a lessee other than Fortuna on the basis of $3.50 per thousand feet of lumber manufactured. Sometime prior to January 24, 1958, the Division of Highways, State of California, had been considering condemning part of the millsite at Fortuna, California. The institute was able to prevail upon the highway department to purchase the entire property rather than to condemn a part. In July 1959 the property was sold by the institute to the highway department for $300,000, payment being made to the parties pursuant to the agreement, effective February 1, 1958, as follows:

| | |
|---|---:|
| Expenses of sale | $8,781.68 |
| 10 percent of residue to institute | 29,121.83 |
| 90 percent of residue to promisees of principal note | 262,096.49 |
| | 300,000.00 |

The $8,781.68 expenses of sale included $8,765.48 paid to one of petitioner's corporate enterprises in reimbursement for payments for taxes and maintenance of the property which it had made.

Upon sale of the assets to the highway department and the disbursement of the proceeds, the entire sales agreement between the selling shareholders and the institute was terminated.

The following table shows Fortuna's net profits before payment of rent and income taxes, the amount of payments made by Fortuna under the lease and license agreement to the institute, and the amount of pay-

ments by the institute to the shareholders on its note for the years involved in the sale transaction:

| Period covered | Fortuna net profit before rent and income taxes | Payments by Fortuna to institute per lease and license agreement | | Payments by institute on promissory note |
|---|---|---|---|---|
| | | 80 percent of net profits | Other | |
| Feb. 4, 1953–Apr. 30, 1953 | $46,206.91 | $36,945.53 | | $38,250.98 |
| May 1, 1953–Apr. 30, 1954 | (4,748.23) | 7,496.84 | [1] $1,796.08 [1] 84.23 [2] 5,201.67 | 13,829.14 |
| May 1, 1954–Apr. 30, 1955 | 521,585.16 | 396,019.61 | [2] 4,098.00 | 360,515.65 |
| May 1, 1955–Apr. 30, 1956 | 331,867.84 | 263,387.55 | 1,450.00 | 238,498.80 |
| May 1, 1956–Apr. 30, 1957 | (6,736.42) | 142.50 | | |
| Subtotals | 888,175.26 | 703,992.03 | 12,629.98 | 651,094.57 |
| May 1, 1957–Oct. 31, 1957 | (83,681.21) | | | |
| Nov. 1, 1957–Apr. 30, 1958 | | | [3] 20,849.29 | 20,849.29 |
| May 1, 1958–Oct. 31, 1958 | | | [2] 989.00 | 989.00 |
| Nov. 1, 1958–Apr. 30, 1959 | | | | |
| May 1, 1959–Oct. 31, 1959 | | | [4] 1,102.50 | 1,102.50 |
| | | | | 674,035.36 |
| | | | | [5] 262,096.49 |
| | | | | 936,131.85 |

[1] Workmen's compensation dividend.
[2] Proceeds from sale of capital assets.
[3] Settlement of $20,991.79 promissory note given to institute by Fortuna.
[4] Proceeds of sale of right-of-way and sale of capital assets.
[5] Proceeds of sale of assets to California Highway Department.

Each petitioner determined his gain on the sale of his stock by treating the amount to be received as his proportionate share of $1,175,000 (the $1,300,000 face amount of the note less the $125,000 of notes) and subtracting therefrom the basis of his stock. Each petitioner reported his gain upon the installment basis on his returns determining the amount that constituted gain in each year by applying to the amount he received from the institute in that year the percentage that his total gain on the sale bore to the total amount to be received. Each petitioner treated his gain in each year as long-term capital gain. Respondent, in his notice of deficiency, computed the gains from the transaction by the same method petitioners had used on their returns but added to each petitioner's basis for his stock his allocable portion of the amount of $1,500.82 representing legal fees paid by Clay Brown & Company in 1953 which respondent determined constituted a constructive pro rata dividend to petitioners. Respondent determined that each petitioner's gain arising from the transaction in each year as so computed constituted ordinary income.

Some of the facts have been stipulated and are found accordingly.

### ULTIMATE FINDINGS.

The agreement entered into between petitioners and the institute under date of February 4, 1953, constituted a bona fide sale of petitioners' stock in Clay Brown & Company to the institute for a price

arrived at in an arm's-length transaction. The amounts received by petitioners from the institute pursuant to this agreement are proceeds from the sale of their stock.

The principal amount of the note given by the institute to petitioners in payment for their stock in Clay Brown & Company and the note of that corporation to Clay B. Brown and Dorothy E. Brown was $1,300,000. This note was without interest until maturity. In arriving at the sales price of the stock, no consideration was given by the parties in their negotiations to an amount in lieu of interest.

OPINION.

The primary issue presented is whether petitioners are entitled to treat the gain realized by them upon the disposition of the Clay Brown & Company stock as a long-term capital gain. Respondent contends in the alternative that if it should be decided contrary to his determination that the gain realized by petitioners is long-term capital gain, part of the amounts received by petitioners is properly attributable to interest and thus taxable as ordinary income.

Petitioners' position is that the gain they realized resulted from the sale of a capital asset, the stock of Clay Brown & Company, held for over 6 months and, consequently, they are entitled to report the gain as a long-term capital gain.

Respondent first argues that, if it be assumed that the petitioners have, in fact, sold their stock in accordance with the numerous documents which purport to reflect such a sale, the petitioners retained such an economic interest in and control over the property sold that the transaction should not be treated as resulting in long-term capital gain for purposes of Federal income tax, citing *Gregory* v. *Helvering*, 293 U.S. 465 (1935); *Higgins* v. *Smith*, 308 U.S. 473 (1940); *Griffiths* v. *Helvering*, 308 U.S. 355 (1939); and *Burnet* v. *Harmel*, 287 U.S. 103 (1932).

Respondent asserts that in the transaction the selling shareholders retained control of the corporate assets via the security instruments executed by the institute and the management contract between Fortuna and petitioner and retained control of the profits by receiving them as payment on the purchase price. On the other hand, respondent observes, the buyer, the institute, neither put up assets of its own nor assumed any risk with respect to the purchase.

Respondent's second contention is that the numerous documents present in this case, though cast in terms of, and presenting a picture of, a sale, did not, in fact, represent the substance of the transaction intended by the parties, the transaction in substance being an arrangement whereby petitioners would siphon off the profits from the corporate business at capital gains rates and then terminate it by the

institute turning back the properties to petitioners. Respondent asserts that it was the intention of the parties that the payments by the institute on the purchase price at the rate of 90 percent of the institute's receipts from Fortuna would be stopped and the property reacquired by the petitioners any time the petitioners deemed such reacquisition appropriate. Respondent contends that this result could be accomplished under a tacit agreement to this effect which he asserts existed between petitioner and the institute or by petitioner's having Fortuna withhold payments to the institute, thus "triggering" a default on the purchase agreement.

Both of respondent's contentions are based on a lack of substance to the purported sale, his first argument assigning as a reason that the transaction did not change the control over and economic benefits from the property and his second that it was never the intent of the parties that the institute actually acquire the properties.

The facts in the instant case do not support either of respondent's contentions. Petitioners by the transaction here involved parted with their equitable ownership of the assets when they transferred their stock to the institute and became the creditors of the institute with mortgages and a management contract as security for the payment of the purchase price of the stock. This change of interest constitutes a change of economic benefits thus distinguishing this case from the cases relied on by respondent.

*Griffiths* v. *Helvering*, *supra*, and *Higgins* v. *Smith*, *supra*, each involved a transaction whereby assets were sold or transferred to a corporation wholly owned by the taxpayer. The Supreme Court held in each instance that the taxpayer by virtue of his 100-percent stock ownership of the corporation had as much economic interest in and control over the assets as if he held them outright. In *Burnet* v. *Harmel*, *supra*, the taxpayer leased oil lands in return for a bonus, i.e., a downpayment, and a royalty on all oil produced. The lease was for 3 years and thereafter as long as oil was produced, the oil which had not been extracted to revert to the lessor upon termination of the lease. The Supreme Court held that the transaction did not constitute a sale of the oil in place for tax purposes because the passage of title to the oil to the lessee was merely incidental to his primary right acquired under the lease which was the right to go upon the land and drill for oil.

In the present case the stock was transferred outright to the institute and such transfer was basic to the entire transaction. Here there would be no reversion to petitioners of the assets which the institute received from the stock sold to it unless there was a default in the payments on the notes given for the stock. The interest of the petitioners would continue not *infinitum* as in *Burnet* v. *Harmel*, *supra*,

but only until the purchase price of the stock was paid.  *Gregory* v. *Helvering, supra,* involved a transaction which the Supreme Court held was "an operation having no business or corporate purpose—a mere device which put on the form of a corporate reorganization as a disguise for concealing its real character * * *."   There was a clear business purpose in the instant case on the part of all parties thereto. Petitioners were able to sell their stock at a price agreeable to them, the institute obtained funds by the retention of 10 percent of the rental payments from Fortuna and expected to obtain funds from the sale of the assets after the note was paid in full, and the stockholders of Fortuna expected that corporation to have income from the 20 percent of its operating profits that it was to retain.

Respondent argues that petitioners would not have been interested in the transaction had they not thought that the profits received on the sale of the stock would be taxable as long-term capital gain. Assuming that respondent's argument in this regard is correct, it does not follow that there was a lack of substance to the sale of the stock.  It may be, as respondent contends, that petitioner would have been unable to sell the stock at as favorable a price to anyone other than a tax-exempt organization.   This fact does not indicate that there was no business purpose in the sale.   As the Court stated in *Gregory* v. *Helvering, supra,* "The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted."   Certainly, the right of a taxpayer by legal means to increase the amount received from a transaction over what he might have received from a different transaction is fundamental.   So long as a sale to an exempt organization of stock in a corporation engaged in a commercial business is legal, such a sale, where it is in substance as well as in form a sale, is not to be ignored for tax purposes solely because the exempt organization is willing to pay a somewhat higher price than someone else might pay.

The capital gains provisions of the Code constitute an exception to the normal tax requirements and are to be narrowly construed, *Raymond Bauschard,* 31 T.C. 910, 916 (1959), affd. 279 F. 2d 115 (C.A. 6, 1960), and cases there cited.   Even a narrow construction of these provisions does not support a conclusion that they should be inapplicable to a sale to a tax-exempt organization.

Respondent's second argument is based on his assertion that in substance there was no sale, it being the intent of the parties that at some future date the assets would be returned to petitioners.   In support of his position respondent relies primarily on statements in a letter written by one of petitioners' attorneys to the attorney for the institute wherein reference is made to the possibility that a situation might arise creating a default under the mortgage warranting a

foreclosure. The portions of this document relied upon by respondent are set forth in our findings. In our view the reference to returning the properties to petitioners is intended to refer only to the situation in which petitioners would have the right otherwise to foreclose on the properties. George Castera, president of the institute, testified unequivocally that the main reason the institute entered into the transaction was that it hoped that the note could be paid off and the institute obtain the properties which it planned to sell to obtain money for use in cancer research.

Upon consideration of all the evidence in this case we hold that the transaction constituted a bona fide sale by petitioners to the institute arrived at in arm's-length negotiations and devoid of any tacit understanding of the parties to collapse the deal at a time deemed appropriate by petitioners or of any plan or arrangement for artificially triggering a default.

There is substantial evidence in the record in addition to Castera's testimony to support our conclusion. The institute was not a creation of petitioners but had been in existence a number of years before the transaction here involved occurred. It was the moving party in seeking a corporation to buy. The institute took steps to ascertain exactly what it was purchasing. Seagrave spent a day and a half or 2 days looking over the business premises at Fortuna. The institute requested balance sheets, statements of earnings, and asset appraisals from petitioner. Petitioner was requested to bring the balance sheet and asset appraisals up to date. The institute inquired into petitioner's business reputation. Numerous drafts of the proposed purchase agreement and related documents were made by the parties.

The price of $1,300,000 (including the $125,000 of notes) was the result of real negotiating. It was within a reasonable range in light of the earnings history of the corporation and the adjusted net worth of the corporate assets. The lease and license agreement between the institute and Fortuna required that the majority of the stock in Fortuna be held only by persons approved by the institute. In 1955 when the millsite property at Fortuna was damaged by river flooding, Castera contacted a top-ranking Pentagon official with the hope of having work done on the river. In 1957 a real dispute arose between the institute and Fortuna respecting the amount of rent due the institute. Fortuna was organized with more than nominal paid-in capital and the amount was paid by and the stock held by persons other than petitioners. Since these persons were petitioner's attorneys, it may be that they were willing to organize and finance the operating company in reliance on petitioner's ability as the manager of that company, but this is merely another way of saying that with petitioner as manager, they hoped to make a

profit from their investment in the operating company, which certainly is a bona fide business purpose.

These facts and others set forth in our findings negate respondent's contention that the transaction was a sham.

Respondent relies primarily upon *Emanuel N. (Manny) Kolkey*, 27 T.C. 37 (1956), affd. 254 F. 2d 51 (C.A. 7, 1957), in support of his second argument. That case involved a factual situation distinguishable in many respects from the instant case. There, the tax-exempt organization was sought out by the seller, the stock was transferred to a new operating company, the stock of which was owned by the tax-exempt organization, with dividends to be paid to the tax-exempt organization, the selling price for the stock was almost four times its fair value, the new operating company was set up with an extremely short cash position, the business was highly speculative, its effectiveness had been impaired by adverse governmental rulings, and the operating company stock was transferred to the original sellers of the old corporation stock after 11½ months. Cf. *Estate of Ernest G. Howes*, 30 T.C. 909, 925 (1958), affirmed sub nom. *Commissioner* v. *Johnson*, 267 F. 2d 382 (C.A. 1, 1959). On the facts present in *Emanuel N. (Manny) Kolkey, supra*, the conclusion was reached that there had been, in fact, no sale of the corporate stock but rather that the stock had been contributed to the new operating company as equity capital and the amount received at the time of the purported sale constituted a taxable dividend.

In the present case we have a transaction whereby petitioners parted with their stock to an unrelated company for the considerations covered in the agreements negotiated at arm's length. The following language in *Union Bank* v. *United States*, 285 F. 2d 126, 128 (Ct. Cl. 1961), which dealt with a transaction quite similar to the instant case, is equally applicable to the facts here present:

From the standpoint of the Goldenbergs, they were, before the 1951 transaction, the owners of valuable properties and a valuable going business. * * * After the 1951 transaction the Goldenbergs had no interest in these assets, except a security interest, the power to take them back in case of default in payment for them. If they increased in value because of general prosperity or business success, or in dollar value because of inflation, the Goldenbergs would get no part of that important incident of ownership. * * *

We think it is logically and legally impossible for an owner to part with his property, for a consideration, without selling it. The consideration which he gets for parting with his property is not income from the property, but is the price of his parting with the property.

We hold that the profit received by petitioners from the sale of their stock to the institute constitutes long-term capital gains.

Respondent contends in the alternative that should it be decided that the disposition of the Clay Brown & Company stock qualifies for

long-term capital gains treatment, part of the payments received by petitioners from the institute constitutes payments of interest on the unpaid balance of the purchase note taxable as ordinary income. Respondent states that the factor of interest was contemplated by the parties in arriving at the ultimate purchase price and that the rate so contemplated was 6 percent.

We have found as a fact that interest was not contemplated by the parties in arriving at the ultimate purchase price. Petitioner specifically justified the price he was asking on the basis of the value of the business as a going concern and its earnings record. The institute in dealing with petitioner discussed the amount it was willing to pay for the business on a similar basis. The finally agreed price was arrived at in an arm's-length transaction and it was specifically provided both in the purchase agreement and the note executed pursuant thereto that there was to be no interest due on the unpaid balance of the note prior to the date of maturity which would occur on a specified date or an accelerated date upon failure of the institute to pay a specified sum over any 2 consecutive years, neither of which events occurred. The summary of the statement read by Seagrave contained in the minutes of the meeting of the board of directors of the institute of January 6, 1953, contains, among other reasons for justifying the price to be paid for petitioners' stock, a computation of the amount that interest at 6 percent on the unpaid balance of the appraised value of the assets would total over a 5-year period. This was merely a part of a statement by a representative of one party to the transaction and formed no part of the negotiations between the parties or the agreement between them as to the purchase price of the stock.

We have consistently refused to consider a portion of a total purchase price as constituting interest where as here the agreement of the parties was clearly for a price without interest. *Carl Lang et al.*, 3 B.T.A. 417 (1926); *Elliott Paint & Varnish Co.*, 44 B.T.A. 241 (1941); and *M. C. Parrish & Co.*, 3 T.C. 119 (1944), affd. 147 F. 2d 284 (C.A. 5, 1945). Cf. *Brandtjen & Kluge, Inc.*, 34 T.C. 416, 447 (1960), and cases there cited.

The circumstances in *Elliott Paint & Varnish Co.*, *supra*, are quite similar to those here involved, the primary distinctions being that in that case the seller had made the unilateral interest computation in considering the price she was willing to take and the purchaser was not a tax-exempt organization. The question in *Elliott Paint & Varnish Co.*, *supra*, concerned the deductibility of interest by the purchaser. Absent a statutory provision to the contrary, the same rules should govern in determining whether interest is includible in income by the seller as are used to determine whether interest is deductible

by the purchaser. Since we have held that the transaction between the petitioner and the institute was arm's length and was not a sham and that the price negotiated by the parties was not intended to include an element of interest, the factual distinctions between the instant case and *Elliott Paint & Varnish Co.*, *supra*, are not significant.

We have, in cases in which monthly payments on property designated as rental were held in fact to be payments on the purchase price, found that a part of each payment constituted interest where the evidence showed that the agreement between the parties contemplated a payment in the nature of interest. *Judson Mills*, 11 T.C. 25, 33, 34 (1948). We have also considered a discount from the face amount of a loan to be deductible as interest. *John Randolph Hopkins*, 15 T.C. 160, 181 (1950). Cf. *M. C. Parrish & Co.*, *supra*, in which a note issued at a discount was distinguished from a deferred price which might be higher than a cash price.

Respondent's argument that a part of the payments received by petitioner was in fact interest is again an attack on the transaction as not bona fide, his contention being that interest was actually considered by the parties "but remains hidden behind the veil of documents evidencing the ultimate price of the stock." We have found that interest was not considered in negotiating the price of the stock, that the transaction was bona fide and did in substance as well as form constitute a sale by petitioners of their stock in accordance with the terms set forth in the purchase agreement, a part of which was the provision that the note given to petitioners was without interest.

Even if the evidence supported respondent's contention that the purchase price of $1,300,000 had been shown to contemplate $237,112 of interest, it would not follow necessarily that any portions of the payments made in the years here involved were interest. Where a payment is made on an interest-bearing debt without designation by either party as to whether the amount is to be credited to principal or interest, the payment will first be credited to interest and then to principal, *Theodore R. Plunkett*, 41 B.T.A. 700–709 (1940), affd. 118 F. 2d 644 (C.A. 1, 1941), but where the parties have agreed as to the allocation of a payment as between principal and interest, their agreement will be recognized. *Huntington-Redondo Co.*, 36 B.T.A. 116 (1937). The rules regarding the application of payments, where more than one debt exists, are that the payment will be applied as the debtor directs but if the debtor fails to make such an application, the payment will be applied as the creditor directs. *Chicago & North Western Railway Co.*, 29 T.C. 989, 996 (1958), appeal dismissed (C.A. 7, 1958).

It is clear in the instant case that petitioners treated the payments received in the taxable years here involved as payments on the princi-

pal amount of the purchase price of their stock and so allocated the payments by treating the full amount of such payments on their income tax returns as receipts of the purchase price of their stock. Cf. *Lincoln Storage Warehouse*, 13 T.C. 33, 40 (1949), affd. 189 F. 2d 337 (C.A. 3, 1950).

If the evidence did support respondent's contention that $237,112 of the $1,300,000 was intended to be in lieu of interest, it would follow that since there was no contrary agreement between the parties petitioners would be entitled to have their allocation of the payments to principal recognized until the entire principal had been paid. This event not only did not occur in the taxable years here involved but never occurred. The facts show that the total payment received by petitioners at the conclusion of the transaction was only $936,131.85.

Respondent's own determination of the gain as set forth in the notice of deficiency recognizes petitioners' allocation of the amounts received from the institute and is inconsistent with an allocation of any portion of the payments to interest. Respondent, accepting the method used by petitioners on their returns, computed each petitioner's gain from the transaction by treating the amount to be received for the stock as $1,175,000 which was the face amount of the note less the $125,000 attributable to the notes due to petitioner. Respondent allocated the $1,175,000 to each petitioner on the basis of the percentage of stock he owned to the total stock sold. From the amount to be received by each petitioner as so determined, respondent subtracted that petitioner's basis in his stock and considered the remainder to be the net gain to be received from the transaction. Respondent then applied the percentage which the net gain as computed for each petitioner bore to the total amount to be received by that petitioner to the amount received in each year here involved to determine the taxable net gain for that year. This method of determining the amount of gain received by each petitioner in each year is based on the assumption that the entire $1,175,000 face amount of the note is the price received for the stock. To be consistent with his present contention, respondent should have considered only approximately $927,888 [2] to represent the amount to be received for the stock and computed the net gains and the percentage of the payments in each year that constituted gains accordingly. The allocable portion of the interest should have been considered to constitute a separate item of income.

In support of his position respondent cites *Wilshire Holding Corporation* v. *Commissioner*, 262 F. 2d 51 (C.A. 9, 1958), reversing a Memorandum Opinion of this Court. In that case the Court of Ap-

---

[2] $1,175,000 minus $237,112 less whatever portion of assumed interest respondent considered applicable to the $125,000 of notes.

peals held that this Court was not precluded by a prior circuit court decision in the same case from determining whether under the facts there present an allocation of payments made to purchase real estate between principal and interest payments was appropriate. The case is not in point under the facts of the instant case. Here, the parties, themselves, have expressly provided for payment on a purchase price without a provision for interest except under circumstances which did not occur. In *Wilshire Holding Corporation* v. *Commissioner*, *supra*, a transaction in form a rental agreement was held in law to constitute a sale agreement. Under such circumstances the circuit court held that consideration could be given to whether, in fact, some portion of the payment should be considered as interest.

We hold that no part of the payments received by petitioners is allocable to interest.

Certain adjustments made by respondent are not contested by petitioners.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

WITHEY, *J.*, dissenting: I concur in the dissent of Judge Pierce. It is true that the institute, prior to embarking upon the "sale" transaction here, made an investigation of Clay Brown & Company as though its intent was to carry out a real sale. In my view, this investigation was part and parcel of the elaborately developed bailout plan and is nothing more than window dressing. I doubt if the 10 percent "rental" retained by the institute was in consideration of its services rendered because I do not believe that it rendered any services. I would have held the 10 percent retention to have been in essence a gift.

TURNER, *J.*, agrees with this dissent.

PIERCE, *J.*, dissenting: The Supreme Court said in *Griffiths* v. *Helvering*, 308 U.S. 355:

We cannot too often reiterate that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed— the actual benefit for which the tax is paid." *Corliss* v. *Bowers*, 281 U.S. 376, 378. And it makes no difference that such "command" may be exercised through specific retention of legal title or the creation of a new equitable but controlled interest, or the maintenance of effective benefit through the interposition of a subservient agency. * * *

I am impelled to dissent from the majority opinion herein, because I believe that inadequate effect was given to the foregoing principles, and that the case has been wrongly decided.

## I.

The intricate series of transactions here involved is typical of a widely publicized tax avoidance plan, sometimes referred to as a

"Bail-Out Plan" or a "Bootstrap Sale." [1]  The objective of such a plan is to set up a procedure, whereby low-basis stockholders of a close corporation which has large accumulated earned surplus and prospects for good future earnings, might "bail out" these earnings and future profits at less than the normal tax cost, without disruption of the continued business operations, and with the "sellers" retaining their command and control over such operations while the bailout is in process.  An indispensable feature of such a plan is a purported "installment sale" of the business to a tax-exempt charitable organization, through which the plan is operated and the future tax-free business profits are "channeled" back to the "sellers"—without the charity making any investment from its own assets or assuming any personal liability.

Of course, the fact that the plan is devised for tax avoidance purposes is not alone sufficient to condemn it; but this factor does justify close scrutiny of what *in reality* has been done. As was recently said by the Court of Appeals for the Fifth Circuit in *United States* v. *General Geophysical Co.*, 296 F. 2d 86:

These tax avoidance implications do not constitute a license to courts to distort the laws or to write in new provisions; they do mean that we should guard against giving force to a purported transfer which gives off an unmistakably hollow sound when it is tapped. * * *

## *II.*

What happened in the present case may be summarized as follows. The petitioners (consisting of Clay Brown, his wife and three children, and the two Booths—all of whom are herein referred to as the Brown group) owned all or substantially all the issued and outstanding shares of capital stock of Clay Brown & Company, which had certain lumber interests and operated a sawmill near Fortuna, California.  The aggregate cost basis of the Brown group's investment was only about $42,000; whereas the corporation had, as of January 31, 1953, an accumulated earned surplus of $448,472, and prospects for good future earnings as its timber was utilized and the lumber was sold.

In the summer of 1952 Clay Brown, who was president of the company and also the representative of the Brown group, had a conference with a business promoter who supplied him with brochures pertaining to the bailout plan of procedure.  These brochures pointed out the hazards of heavy tax penalties on the corporation for unreasonable accumulation of surplus, the "ruinous" possible effects of estate and income taxes if the Browns' investment were retained in the business or current dividends were paid, and the advantages of using

[1] Moore and Dohan, "Sales, Churches, and Monkeyshines," 11 Tax L. Rev., 87 (1956) ; Lanning, "Tax Erosion and the 'Bootstrap Sale' of a Business," 108 U. P. L. Rev. 623 (1960) ; MacCracken, "Selling a Business to a Charitable Foundation," U. of So. Calif., 1954 Tax Inst. 205, 209.

the bailout plan to relieve such situation. The upshot was that the Brown group decided to embark on such a plan; specific details for adapting the plan to the particular situation were worked out; a complicated set of interrelated legal instruments was drafted to give effect to the plan; and then, as of February 4, 1953, the following steps were taken:

(a) The Brown group endorsed and delivered all their shares of stock of Clay Brown & Company to the charitable organization here involved (called the institute), together with $125,000 face amount of promissory notes of said company that were then held by Clay Brown and his wife. The institute at the same time delivered to the Brown group, as purported consideration therefor, its "promissory note" in the face amount of $1,300,000, which was dated to mature about 10 years later, which was nonnegotiable and noninterest bearing; with respect to which the institute assumed no personal liability whatever for its payment; and on which payments were to be made solely out of so-called rentals derived from the future profits of the continuing business, in the manner more fully described. The institute invested none of its own assets in exchange for the stock; and indeed, it had no such assets available for investment, because its receipts came principally from donations made to it for charitable purposes. Clay Brown did not even inquire regarding its assets or its financial responsibility.

(b) The institute as "buyer" of the stock, had no discretion whatever as to what disposition it might make of the property; for all details as to such disposition were specifically arranged and provided for in the various predrafted instruments of the plan. These included the following steps which were then followed: (1) The Clay Brown & Company was dissolved; (2) $5,000 of the underlying current assets were withdrawn and turned over to the Brown group as a "down payment," in order to set up a purported "installment sale" for the transferred stock; (3) the remaining net current assets were "sold" for another promissory note to a new thinly capitalized corporation named Fortuna Saw Mills, Inc., which had theretofore been organized in the office of Clay Brown's attorneys, for the specific purpose of taking over and continuing the operations of the former business of Clay Brown & Company; (4) all other assets of the business, both real and personal, were thereupon mortgaged back to the Brown group; and (5) these same assets were then "rented" by the institute to the new Fortuna company, under arrangements whereby 80 percent of the net profits of the business, before any allowances for depreciation or for State and Federal taxes, were to be distributed currently to the institute as "rentals," and whereby 90 percent thereof were then to be paid over to the Brown group as purported "credits" on the above-mentioned $1,300,000 note.

(c) Concurrently and as part of the plan, Clay Brown was employed as "general manager" for the new Fortuna company at an annual salary of $25,000; and further provision was made that, if for any reason he ceased to act as such, his successor would be selected by the Brown group. The powers given to Brown in such capacity were substantially the same as those which he had previously exercised as president of Clay Brown & Company. No property could be sold without his consent. When mortgage loans of the Clay Brown & Company were transferred into the name of the new company, Brown personally guaranteed them (for the entire capital stock of the new company was equal only to Brown's first year's salary). And Brown also, on another occasion, personally guaranteed a $50,000 bank loan to the new company.

The new Fortuna company took over and continued operation of the business, without interruption; and it thereafter continued to operate the same for about 4½ years on the same premises, with the same operating personnel, with both the control and management thereof in the hands of Clay Brown, and with no practical difference except as to name. During said period, it harvested over 20 million feet of timber from the interests which it had taken over from the Clay Brown & Company; and it currently paid out its profits, before depreciation and before taxes, in the manner above described.

These operations continued until June 19, 1957, when Fortuna Mills shut down its mill and permanently discontinued business. Thereupon, an appraisal was made of the remaining net assets of the business; and this revealed the salable value of the same to be about $300,000, as compared with the appraisal made prior to the purported "sale" of over $1 million.

In July 1959, the entire remaining assets of the business were sold to a third party for $300,000; and out of the net proceeds, the Brown group then received 90 percent, and the institute received its familiar 10 percent. Thereafter, in accordance with a "settlement" between the Brown group and the institute, the $1,300,000 "promissory note" of the institute was canceled; and also all of the "mortgages," "rental agreements," "assignments," and other instruments which had been employed under the plan, were likewise canceled.

The net financial result of the plan's operation was that the Brown group received out of its investment during the time that the plan was in operation, a total of $936,131.85; and the institute received nothing except its 10 percent withdrawals from the current distributions which passed through its hands. It is the above amount of over $900,000 which the Brown group has contended should be taxed at the preferred capital gains rates after spreading on the installment sale basis; and it is this amount also which the respondent determined should be taxed as ordinary income from the continued operation of

the business, after adjustment for exhaustion of the Brown group's original investment.

### III.

When the foregoing intricate series of transactions are viewed in the light of their *realities*, when consideration is given to who had the *command* and *control* over the business, who bore the *risks of its operation*, and who was entitled to enjoy the substantial *benefits* therefrom—I believe the same will not support a conclusion that the business actually was "sold" to the institute, or that the Brown group received its share of the profits solely in the capacity of "creditors" of the institute.

Moreover, it is doubtful whether there was any legally sufficient "consideration"[2] delivered by the institute which would support a valid sale. It invested nothing out of its own assets; assumed no personal liability for payment of the $1,300,000 "promissory note"; and became entitled to receive only what was, in effect, a 10 percent "service fee" for its assistance in carrying out the plan. All acts done were for the *primary benefit of the Brown group;* and the institute was, in reality, merely an interposed subservient agency (see quotation from *Griffiths* v. *Helvering, supra*).

In the leading case of *Gregory* v. *Helvering*, 293 U.S. 465, the Supreme Court refused to give effect to corporate transactions which complied precisely with the formal requirements for nontaxable corporate reorganizations, on the ground that the transactions had served no functions other than that of a contrivance to bail out corporate earnings to the sole shareholder at capital gains tax rates. In *Commissioner* v. *Court Holding Co.*, 324 U.S. 331, the Supreme Court taxed a corporation on the gain from sale of an apartment house notwithstanding a transfer of the house to the corporation's two shareholders before the sale, since it found that the transfer was made solely to set in a more favorable tax form, a sale which in reality was made by the corporation. Similarly, in *Helvering* v. *Clifford*, 309 U.S. 331, the Supreme Court taxed a trust grantor on the income of the trust property, since the formal transfer of the property by the grantor was lacking in substance. The Court found that the dilution of the grantor's control seemed insignificant and immaterial, and that

---

[2] See in this connection, 1 Williston, Contracts, sec. 112, p. 445 (3d ed. 1957). There Williston, in his discussion of consideration, gives the illustration of a man saying to a tramp: "If you go around the corner to the clothing shop there, you may purchase an overcoat on my credit." Williston says that although the walk might be regarded as a legal detriment to the tramp, yet it is not "consideration" because, on a *reasonable interpretation*, the walk was not requested as the price of the promise but merely as a condition of a gratuitous promise.

See also *Evans* v. *Rothensies*, 114 F. 2d 958 (C.A. 3), wherein the taxpayer "sold" preferred stock to a penniless son-in-law, for a joint-and-survivor annuity of slightly less than the dividends. Nearly all the stock was held in escrow to secure the annuity payments. The court held that the stock transfer was "hardly more than a gift," with *retention* of a partial interest in the income from the stock for the lives of the "seller" and his wife.

"since the husband retains control over the investment, he has rather complete assurance that the trust will not effect any substantial change in his economic position."

See also the recent case of *Knetsch* v. *United States*, 364 U.S. 361; *Emanuel N. (Manny) Kolkey*, 27 T.C. 37, 57–62, affd. 254 F. 2d 51 (C.A. 7); and the recent Fifth Circuit case of *United States* v. *General Geophysical Co., supra.*

I would have held that the Brown group made no valid "sale" to the institute of their equity interests in the business.

TURNER, RAUM, WITHEY, ATKINS, and MULRONEY, *JJ.*, agree with this dissent.