WARREN BREKKE, TRANSFEREE, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 79302. Filed August 2, 1963.

*Richard F. Alden* and *Henry C. Diehl*, for the petitioner.
*Marion Malone*, for the respondent.

TRAIN, *Judge:* Respondent determined deficiencies in the taxes of Weiser Company, transferor, as follows:

| Year | Tax | Amount |
|------|-----|--------|
| 1953 | Income and excess profits | $89,152.26 |
| 1954 | Income | 131,698.45 |

---

[13] Sec. 122(a) ; sec. 172(c), I.R.C. 1954.

Respondent further determined that petitioner was liable, as transferee, for Weiser Company's deficiencies for those years to the extent of $1,727.12.

The only issues presented relate to the deficiencies determined against the transferor: [1]

(1) Whether the amounts it paid in the form of rent to University Hill Foundation are deductible as rental expense; and

(2) Whether certain expenditures totaling $26,504.71 are deductible as expenses or otherwise for 1954.

### FINDINGS OF FACT

Some of the facts are stipulated and are hereby found as stipulated. Our use of "sale," "lease," and corresponding terms is merely for ease of expression. As our opinion indicates, we are not persuaded that the transactions so denominated in this case should be given the Federal income tax consequences normally resulting from leases and sales.

Petitioner, Warren Brekke, resides in Salt Lake City, Utah. He is one of 54 transferees of a dissolved corporation, Weiser Company, hereinafter sometimes referred to as Weiser #2. Weiser #2 filed its accrual basis Federal income tax returns for the calendar years 1953 and 1954 with the district director of internal revenue at Los Angeles, Calif.

On or about November 23, 1945, Weiser Company (hereinafter sometimes referred to as Weiser #1) was incorporated in California. On December 1, 1945, Weiser #1 entered into the business of manufacturing and selling hardware, particularly locks for residential uses. It was a continuation of a partnership which had previously conducted this business.

Weiser #1's original stockholders were David Weisz, Edward Meltzer, Julius Fligelman, and Philip Meltzer. Although he was president and general manager of Weiser #1, Fred J. Russell (hereinafter sometimes referred to as Russell) was not, at first, a stockholder. About a year after Weiser #1's incorporation, Russell purchased one-third of its common stock.

---

[1] The petitioner admits that he is a transferee of Weiser Company's assets in the amount of his alleged liability. The parties in Docket Nos. 79303 through 79355 have stipulated that our decision as to the transferor's tax liability in this case will be controlling in those dockets.

On June 30, 1950, Weiser #1's stock was owned as follows:

| Stockholder | Common shares | Preferred shares |
| --- | --- | --- |
| Edward Meltzer | 1, 083⅓ | 62½ |
| Frieda Meltzer | 416⅔ | 12½ |
| Philip H. Meltzer | 1, 000 | ---- |
| Fred J. Russell | 1, 666⅔ | ---- |
| Julius Fligelman | 416⅔ | 12½ |
| Molly S. Fligelman | 416⅔ | 12½ |
| Total | 5, 000 | 100 |

In June of 1950, Russell was contacted by Malone, representative of University Hill Foundation (formerly Loyola University Foundation and hereinafter sometimes referred to as Foundation), a California corporation, with respect to a sale of all the stock of Weiser #1 to Foundation. Prior to this time Russell had never known or heard of Foundation, nor had he known Malone, and none of the selling stockholders had any interest in Foundation.

One of the Weiser #1 stockholders suggested a total sales price of $990,000, the first amount offered in the negotiations, and that figure was accepted.

On June 30, 1950, an agreement was executed providing for the sale of all the oustanding shares of Weiser #1 for $990,000. The first $10,000 paid was to be allocated to the preferred stock and the remaining $980,000 to the common. Five thousand dollars was to be transferred concurrently to the sellers. The remaining $985,000 was to be paid as follows: For 5½ years (until January 1, 1956), 90 percent of the cash Foundation received either as net profits from operation of the Weiser #1 business assets or as rent from lease of those assets; for 4½ years thereafter (until July 1, 1960) 60 percent of such profits or rents; but during each period at least $4,000 per month; all until the full purchase price was paid. "Net profits" was defined as net profits before income and similar taxes and before depreciation or amortization of any asset owned by Weiser #1 on June 30, 1950. The entire purchase price was in any event due on July 1, 1960. As security, Foundation was to pledge with the sellers all of the Weiser #1 stock. In the event of default, the sellers could enforce payment only out of their collateral.

Attached to the purchase agreement was a balance sheet of Weiser #1 as of July 1, 1950, as follows:

### ASSETS

#### CURRENT

| | | |
|---|---:|---:|
| Cash on hand and in bank | | $6, 918. 75 |
| Accounts receivable, trade | $127, 207. 49 | |
| Less provision for bad debts | 6, 359. 94 | |
| | | 120, 847. 55 |
| Advances and loans receivable—employees and others | | 16, 199. 19 |
| California franchise tax refund receivable | | 1, 256. 34 |
| Inventory | | 126, 557. 49 |
| Unexpired insurance and prepaid postage | | 3, 902. 85 |
| Total current assets | | 275, 682. 17 |

#### FIXED

| | Cost | Provision for depreciation | Cost less depreciation |
|---|---:|---:|---:|
| Land | $8, 757. 35 | ------------ | $8, 757. 35 |
| Buildings | 75, 032. 67 | $8, 150. 58 | 66, 882. 09 |
| Machinery and equipment | 147, 907, 59 | 36, 751. 35 | 111, 156. 24 |
| Furniture and fixtures | 7, 284. 49 | 3, 689. 25 | 3, 595. 24 |
| Tools | 16, 530. 50 | 12, 670. 36 | 3, 860. 14 |
| Dies and molds | 27, 876. 45 | 24, 654. 98 | 3, 221. 47 |
| Patents | 3, 475. 02 | 492. 64 | 2, 982. 38 |
| Truck | 1, 348. 89 | 1, 348. 89 | ------------ |
| | 288, 212. 96 | 87, 758. 05 | 200, 454. 91 |
| Total fixed assets | | | 200, 454. 91 |

#### OTHER

| | |
|---|---:|
| Deposits | 425. 00 |
| Total assets | 476, 562. 08 |

### LIABILITIES

#### CURRENT

| | | |
|---|---:|---:|
| Accounts payable | | $15, 971. 45 |
| Accrued profit sharing | | 15, 187. 35 |
| Accrued wages, commissions, and interest | | 11, 413. 07 |
| Notes and loans payable (due within 1 year): | | |
| Union Bank & Trust Co.—unsecured | $85, 000. 00 | |
| Officer—unsecured | 15, 000. 00 | |
| Union Bank & Trust Co.—secured by first trust deed on real property | 6, 348. 00 | |
| Officer and other—secured by second trust deed on real property | 9, 589. 52 | 115, 937. 52 |

Taxes payable:

| | | |
|---|---:|---:|
| Payroll, including employees' withholding___ | $10, 188. 58 | |
| California sales___ | 9. 77 | |
| Real and personal property___ | 6, 437. 00 | |
| Federal income___ | 36, 761. 21 | |
| California franchise___ | 1, 884. 50 | $55, 281. 06 |
| | | |
| Total current liabilities___ | | 213, 790. 45 |

### LONG TERM

Notes and loans payable (less amounts included in current liabilities):

| | | |
|---|---:|---:|
| Union Bank & Trust Co.—secured by first trust deed on real property___ | 13, 665. 80 | |
| Officer and others—secured by second trust deed on real property___ | 9, 537. 45 | |
| | | |
| Total long-term liabilities___ | | 23, 203. 25 |
| | | |
| Total liabilities___ | | 236, 993. 70 |

### CAPITAL

#### CAPITAL STOCK

| | |
|---|---:|
| Preferred stock; 6% cumulative; $100.00 par value; 100 shares issued and outstanding___ | $10, 000. 00 |
| Common stock; $1.00 par value; 5,000 shares issued and outstanding—stated value___ | [2] 100, 000. 00 |
| | |
| Total capital stock___ | 110, 000. 00 |

#### EARNED SURPLUS

| | | |
|---|---:|---:|
| Balance, November 1, 1949___ | [2] 101, 254. 22 | |
| Net income for period November 1, 1949 to July 1, 1950___ | 28, 914. 16 | |
| | [2] 130, 168. 38 | |
| Less dividends paid on preferred stock___ | 600. 00 | |
| | | |
| Earned surplus, July 1, 1950___ | | [2] 129, 568. 38 |
| | | |
| Total capital___ | | 239, 568. 38 |
| | | |
| Total liabilities and capital___ | | 476, 562. 08 |

[2] At the end of 1949, $95,000 had been transferred from Earned Surplus to Common Stock.

Weiser #1's books and income tax returns showed the following:

| Year ended Oct. 31— | Sales | Net income from sales | Net income before tax | Net income after tax |
|---|---|---|---|---|
| 1946 (11 mos.) | $278, 540. 42 | $98, 421. 87 | $20, 072. 78 | $15, 049. 36 |
| 1947 | 697, 193. 24 | 357, 197. 07 | 50, 754. 24 | 31, 482. 87 |
| 1948 | 1, 053, 351. 60 | 651, 625. 76 | 145, 086. 58 | 89, 953. 68 |
| 1949 | 1, 184, 531. 92 | 693, 332. 91 | 105, 859. 63 | 65, 632. 97 |
| 1950 (8 mos.) | 966, 183. 90 | 505, 166. 04 | 45, 562. 04 | 28, 914. 16 |

Weiser #1 paid no dividends on its common stock. It paid dividends on preferred stock totaling $2,200 as follows:

Year ended Oct. 31:                                 *Amount*

1947 _____ $483. 34

1948 _____ 516. 66

1949 _____ 600. 00

June 30, 1950_____ 600. 00

It was understood by the parties to this agreement that Foundation would liquidate Weiser #1, would transfer the current assets to a new company formed to operate the business (that new company, Weiser #2, would assume in return, the current and fixed liabilities and would give Foundation a note for the difference), and would lease the remaining assets to that new company. It was understood that Russell would be the general manager of that new company. Essentially all the management of Weiser #1 was retained to manage Weiser #2.

Following the purchase of the Weiser #1 stock, Foundation caused Weiser #1 to be dissolved and received the assets on dissolution.

As security for the unpaid balance of the purchase price the Weiser #1 sellers received from Foundation: An assignment of Weiser #1's lease to Weiser #2; an assignment of Weiser #2's note; a chattel mortgage on the personal property received by Foundation on the sale; a deed of trust on the real property received by Foundation on the sale; and a security assignment of Weiser's #1's patents. The patents were reassigned to Foundation on April 13, 1953.

On or about June 21, 1950, Weiser #2 was incorporated in California under the name of Rewise Company. It subsequently changed its name to Weiser Company. Russell became president and general manager of Weiser #2 at approximately the same salary per year as he had received in the positions he held in Weiser #1.

The initial capital of Weiser #2 consisted of 100 shares of $1 par value stock for which there was paid into the company $1,000 in cash. No Weiser #2 stock was ever issued to any of the former stockholders of Weiser #1. Russell's father and brother purchased varying amounts of stock. They never held more than a total of 15 shares. Russell set up the basic criteria as to how many shares of stock could be purchased by employees according to their respective positions in

the company. All but 3 of the 70 persons who ever were Weiser #2 stockholders were employees of Weiser #2. The last stock certificate outstanding to a nonemployee was canceled on January 4, 1952. All stockholders paid cash for the stock received.

Stockholders terminating their employment with Weiser #2 for any reason transferred their shares back to the company at book value as of the preceding December 31. Subsequent acquisitions of Weiser #2 shares were made from the company at book value on the preceding December 31. Amounts in excess of par value received by Weiser #2 for shares were credited on its books to paid-in surplus.

Stockholders who acquired shares in 1950 paid $10 per share; in 1951, $187.58 per share; in 1952, $598.55 per share; and in 1953, $1,148.15 per share. On June 12, 1952, Weiser #2's board of directors granted Russell and his brother, Frank W. Russell, options to purchase 35 and 5 shares, respectively, of Weiser #2. Russell never exercised his option and, at his request, it was canceled early in 1953. However, on December 28, 1953, his brother purchased 5 shares at $598.55 per share.

On or about July 1, 1950, Weiser # 2 entered into a 5-year lease with Foundation covering the assets received by Foundation on the liquidation of Weiser # 1, except for current assets consisting of cash, receivables, inventory, and prepaid items. Those items ($275,-682.17) were transferred to Weiser # 2 in exchange for the assumption of current and long-term liabilities ($236,993.70) and a 5-year non-interest-bearing promissory note for $38,688.47. The note contained no provision for interest in the event it was not paid in full at maturity.

The lease provided that until Weiser # 2 paid a total rental of $1,100,000, the rent would be 80 percent of net profits but not less than $4,500 per month. Thereafter the rent would be 60 percent of net profits. Weiser # 2 was obliged to maintain the premises in a good state of repair. It could make capital improvements with the cost to be credited upon rental to a maximum of $10,000 in any year, unless Foundation consented in writing to a greater amount. Weiser # 2 was to pay all property taxes and to fully insure the property. In the event of damage, the proceeds of insurance policies were to be used to restore the premises. Weiser #2 could not assign the lease or sublet the property without Foundation's written consent. At all times during the continuance of the lease a majority of Weiser # 2's outstanding stock must be held only by such persons as Foundation approved.

By amendment approved November 21, 1952, and effective January 1, 1953, the amount of capital expenditures that could be credited

against rent without Foundation's consent was raised to $50,000 per year. By amendment dated May 7, 1953, the minimum rent for 1953 was reduced to $9,300, payable by October 10, 1953. The minimum rent for 1954 was reduced to $9,300 payable by April 10, 1954, and $7,000 payable by October 10, 1954.

Early in 1953, Foundation borrowed $400,000 from the Bank of America and used the proceeds to pay the balance of the purchase price owing to Frieda Meltzer, Philip Meltzer, Julius Fligelman, and Molly S. Fligelman. The balance owing to Edward Meltzer was paid with $96,650.10 cash and a 60-day promissory note for $49,347.41 bearing interest at 4½ percent. Russell, the last of the sellers to get paid, was fully paid on December 4, 1953. In consideration of this prepayment of the purchase price, Russell and the other sellers agreed to reduce the purchase price of the common stock by $50,000.

By amendment dated April 1, 1954, Weiser #2 agreed to prepay rental if necessary in order to provide funds sufficient for Foundation to pay the principal and interest installments on its note to the Bank of America.

The balance due the Bank of America was paid on December 20, 1954. On December 15, 1954, Weiser #2 and Foundation agreed to cancel the lease as of December 31, 1954. Foundation concurrently returned Weiser #2's note for the current assets less liabilities, on which note no payments had been made. Weiser #2 paid Foundation $100,000 in settlement of all rental obligations to Foundation.

During 1953 and 1954, the sellers of Weiser #1 made substantial loans to Weiser #2. Unsecured notes payable (outstanding balances) on the indicated dates were:

| | Jan. 1, 1953 | Dec. 31, 1953 | Dec. 31, 1954 |
|---|---|---|---|
| Russell and corporations owned by him | $80,000 | $188,000 | $316,000 |
| Russell's relatives | | 1,000 | 2,000 |
| Employees of Russell's corporations | 5,000 | 22,500 | 35,000 |
| Company Russell "connected with" and employee | | 8,500 | 40,000 |
| Other sellers of Weiser #1 | | 100,000 | 100,000 |
| Weiser #2 employees | 7,000 | 11,550 | 19,150 |
| Relationship to Weiser #2 or to Weiser #1 sellers not noted | | | 14,000 |
| Totals | 92,000 | 331,550 | 526,150 |

The total rent due Foundation under the lease was as follows:

| | | | |
|---|---|---|---|
| 1950 | $155,031.58 | Paid by cash | $795,472.05 |
| 1951 | 237,844.28 | Credit for assets purchased | 565,806.60 |
| 1952 | 472,663.87 | | |
| 1953 | 177,638.42 | | 1,361,278.65 |
| 1954 | 279,412.03 | Less: note canceled | 38,688.47 |
| Total | 1,322,590.18 | | 1,322,590.18 |

The following amounts were spent for the acquisition of new assets subject to the lease and were credited against rents in each of the indicated years:

| Year | Spent | Credited against rent |
|---|---|---|
| 1950 (6 mos.) | $15, 899. 27 | $15, 899. 27 |
| 1951 | 56, 663. 46 | 149, 999. 76 |
| 1952 | 177, 315. 38 | 130, 000. 00 |
| 1953 | 271, 337. 20 | 168, 338. 42 |
| 1954 | 44, 591. 29 | 101, 569. 15 |
| | 565, 806. 60 | 565, 806. 60 |

The cash flow to Foundation and then to the sellers was as follows:

Cash received by Foundation:

| | |
|---|---|
| From Weiser #2, 7–1–50 through 12–31–54 | $795, 472. 05 |
| From El Toro Management Co., 12–2–54 | 200, 000. 00 |
| Total | 995, 472. 05 |

Cash paid out by Foundation:

| | |
|---|---|
| To sellers ($990,000 less $50,000 discount) | 940, 000. 00 |
| Interest on note to Bank of America | 9, 287. 50 |
| Interest on note to Edward Meltzer | 277. 50 |
| | 949, 565. 00 |
| Cash retained by Foundation | [3] 45, 907. 05 |
| Total | 995, 472. 05 |

During the 6 months ended June 30, 1954, Weiser #2 expended certain amounts which it considered represented credits against percentage rental under its lease with Foundation. By letter dated July 28, 1954, a list of such expenditures, totaling $71,096, was transmitted to Foundation and a claim for credit against rent was made.

Foundation replied by letter dated July 30, 1954, objecting that the list contained a substantial number of what appeared to be expenses rather than capital items.

After further correspondence on the subject and in connection with the lease cancellation and settlement of accounts between Weiser #2 and Foundation, the parties agreed that expenditures totaling $44,591.29 should be credited against rent. The $26,504.71 difference between the amount claimed as credit against 1954 rent and the agreed amount was, by journal entry dated October 31, 1954, charged to expense accounts of Weiser #2 other than rent. All of the items represented by this entry, to the extent they had not been used up

[3] The figure of $45,407.05 which is contained in Exhibt A appears to be a clerical error.

during the year, were left to Foundation on the cancellation of the lease.

In computing Weiser #2's taxable income for 1954, respondent determined that the expenditure of $26,504.71 resulted in the acquisition of capital assets subject to depreciation. Accordingly, respondent disallowed deductions in the amount of $26,504.71 and allowed in lieu thereof a depreciation deduction in the amount of $2,650.47, for a net disallowance of $23,854.24.

In computing Weiser #2's taxable income for 1953 and 1954, respondent disallowed as rental deductions $177,638.42 and $279,412.03, respectively, but allowed a deduction of $50,000 in each year "for the use of the property which amount has been determined to be a reasonable allowance." On brief, respondent explains that "This sum was approximately the same as the amount of allowable depreciation and is not to be construed as an amount of rent which is reasonable."

On December 31, 1954, Weiser #2 sold all of its assets (current assets and various listed capital assets) to El Toro Management Co. (hereinafter sometimes referred to as El Toro) for $200,000, represented by a 7-percent demand note, plus the assumption of all liabilities except Federal and State income taxes. Included in the assets sold were machinery and factory equipment with an adjusted basis of $102,892.89 and furniture and office equipment with an adjusted basis of $1,961.12. Thereafter Weiser #2 had no assets except the demand note.

On December 20, 1954, Foundation leased to El Toro for a 30-year term the same property and equipment that had been under lease to Weiser #2. The rent was $200,000 for the first 18 months and $100,000 annually thereafter. The initial $200,000 was paid at the time the lease was entered into.

Russell was president of El Toro, which was wholly owned by Southland Water Co., which in turn was wholly owned by Russell. There was no change in management when Weiser #2 canceled its lease with Foundation and El Toro took over the operation of the business.

After December 31, 1954, Weiser #2 collected on the El Toro demand note interest and sufficient principal to satisfy the Federal and State income tax obligations shown on its returns. On April 1, 1955, there remained a balance due of $181,347.85 available on the books for distribution to Weiser #2's stockholders.

On April 1, 1955, that demand note was exchanged for a series of 7-percent demand notes aggregating $181,347.85, one note for each of the 54 stockholders, in amounts representing those stockholders' respective shares of that aggregate amount. Thereupon those notes

were distributed in complete liquidation and Weiser #2 was wound up and dissolved in accordance with California law.

On or about December 28, 1955, much of the property which Foundation had been leasing to El Toro was sold by Foundation for $400,000 to L. G. Development Co. Russell also owned the latter company. Two hundred and forty thousand dollars of the price was allocated to the real property. Of this amount, $25,000 was allocated to the land and $215,000 to the buildings. The remaining $160,000 of the price was allocated to the equipment.

The lease between El Toro and Foundation was amended on December 28, 1955, to reduce the rent from $200,000 for the first 18 months and $100,000 a year thereafter, to $50,000 a year, and to permit the lessee to arbitrarily cancel the lease upon giving the required notice. The property that remained subject to the lease as amended included the name and goodwill of "Weiser Company" and the patents originally subject to the lease.

El Toro subsequently found that, because of modifications in lock design, it was making very limited use of the leased patents. El Toro's determination to cancel the lease led to negotiations culminating in El Toro's purchase from Foundation of the property hitherto leased by it from Foundation.

The fair market value of Weiser #1 at the time of its transfer to Foundation was not more than $500,000.

The amounts paid by Weiser #2 to Foundation as rent pursuant to the terms of the July 1, 1950, lease were not in excess of a fair rental as determined on a percentage basis for a 5-year term commencing on the effective date of the lease.

### OPINION

Respondent maintains that the payments made by Weiser #2 under its lease from Foundation "were in substance the distribution of business earnings and profits before these earnings and profits were properly taxed." Petitioner maintains that the amounts paid under the lease were a reasonable rental,[4] that the assets were used in Weiser #2's business, that Weiser #2 had no equity in the assets, and that the payments were no more than what was required to be paid by the lease. Petitioner also maintains that the bona fides of the 1950 transfer are irrelevant to the issues before us.

We agree with respondent's conclusion.

---

[4] SEC. 162 [IRC 1954]. TRADE OR BUSINESS EXPENSES.

(a) IN GENERAL.—There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including—

\* \* \* \* \* \* \*

(3) rentals or other payments required to be made as a condition to the continued use or possession, for purposes of the trade or business, of property to which the taxpayer has not taken or is not taking title or in which he has no equity.

[Almost identical language appeared in section 23(a)(1)(A) of the 1939 Code.]

This Court has had before it a number of cases involving quite similar fact patterns. In *Emanuel N. (Manny) Kolkey*, 27 T.C. 37 (1956), aff'd. 254 F. 2d 51 (C.A. 7, 1958), and *Clay B. Brown*, 37 T.C. 461 (1961), on appeal (C.A. 9, June 25, 1962), we were faced with the issue of tax treatment of the amounts received by the sellers. In *Kolkey*, we held there was no real sale. In *Brown, Anderson Dairy, Inc.*, 39 T.C. 1027 (1963), and *Royal Farms Dairy Co.*, 40 T.C. 173 (1963), we agreed that the sales were bona fide, giving rise to capital gains for the sellers. In *Anderson* and *Royal Farms* we were faced also with the treatment of lessee corporation's rental payments. Having found the original transfer bona fide in both cases, we allowed deduction of the entire payments in *Anderson* and a reasonable rental in *Royal Farms*. Unlike the four cases above-mentioned, the sellers in this set of transactions are not before us. We are concerned here with the taxes of the lessee corporation.

The picture presented by the evidence is sufficiently involved to warrant a brief summary.

In mid-1950, Weiser #1 was transferred to Foundation for $990,000, later reduced to $940,000, almost double its fair market value at the time.[5] Foundation immediately liquidated Weiser #1 and sold or leased its assets to Weiser #2. The rent called for in the lease was a reasonable rent for the property subject to the lease. Four and one-half years later, Weiser #2's 5-year lease was canceled by mutual consent. Weiser #2 sold the assets it had accumulated to El Toro for $200,000. Foundation leased its assets to El Toro. A year later, Foundation sold its assets, other than patents and the name "Weiser Company," to L.G. Development Co. for $400,000. The patents and the name continued under lease to El Toro until, at some later date, El Toro purchased those items from Foundation for an amount not disclosed by the record.[6] Russell owned

---

[5] Compare *Emanuel N. (Manny) Kolkey*, 27 T.C. 37 (1956), where the Court found the sales price of $4,000,000 was approximately 3.64 times the fair market value; *Clay B. Brown*, 37 T.C. 461, 486, where the Court found the price "was within a reasonable range in light of the earnings history of the corporation and the adjusted net worth of the corporate assets"; *Anderson Dairy, Inc.*, 39 T.C. 1027 (1963), where the Court found the sales price of $1,250,000 was approximately 1.32 times the cash or equivalent fair market value; *Royal Farms Dairy Co.*, 40 T.C. 173 (1963), where the Court found the sales price of $2,680,000 was approximately 1.28 times a minimum cash fair market value.

[6] In *Kolkey*, the business was transferred back to the owners of 45 percent of the predecessor corporation only 11½ months after that corporation had been sold to the charitable organization. The business was a speculative one and was severely hampered by a shortage of operating capital resulting from the use of such capital to make the downpayment for the predecessor corporation's stock. In *Brown*, flood damage to the business property plus a decrease in the sales price of the business' product caused the business to shut down approximately 4½ years after its sale to the charitable organization. Two years later, the property was purchased by a State highway department under threat of condemnation. In *Anderson*, the property was still subject to extensions of the original lease 9 years after the sale to Foundation. In *Royal Farms*, the property was sold to a new corporation dominated by the original sellers. However, this sale, 4 years after the original sale to Foundation, was motivated primarily by fear that an atmosphere of religious prejudice, peculiarly applicable to that type of business at that time and place, would ruin the business unless Foundation ended all connection with the business.

approximately one-third of Weiser #1's stock and none of Weiser #2's stock, but was president and general manager of both corporations. Russell owned, directly or indirectly, all of the stock of El Toro and of L.G. Development Co. During the years which gave rise to the deficiencies here at issue, Russell, his wholly owned corporations, and the other sellers made substantial loans to Weiser #2 and unsecured notes payable to them constituted approximately 80 percent of the outstanding unsecured notes payable at the end of each of Weiser #2's last 3 calendar years.

At best, the evidence in this case is inconclusive on the question we think to be determinative—whether Weiser #2 had any equity in the property subject to the lease. Putting it another way, the question is whether Weiser #2's right to use the property in its business derived from the lease or from Weiser #1's ownership of the property.

The high ratio of sales price to fair market value of the business and Foundation's action to transfer substantially all of the business assets to Russell's corporation 5½ years after their purchase (note the absence of the compelling business circumstances present in *Brown* and *Royal Farms*) combine to give a vastly different color to a set of facts otherwise largely similar to *Brown, Anderson,* and *Royal Farms*. The circumstances of Russell's prearranged employment by and control over Weiser #2 (despite his not being a stockholder), substantial debts owed by Weiser #2 to Russell, his wholly owned corporations, and the other stockholders,[7] the relationship between the rental rates and the amounts Foundation was required to pay the sellers, the substantial earned surplus in Weiser #1, the remarkable tax consequences should the hoped-for tax treatment become actuality, and the absence of evidence regarding negotiations between Foundation and the Weiser #1 sellers, all suggest that a facade was here created. Too, if Weiser #2 capital expenditures were to be credited against rent, we find it difficult to understand how Weiser #2 accumulated machinery and furniture for which it had a basis of over $100,000. These items were transferred to El Toro on December 31, 1954.

We recognize that this record is far less favorable to respondent than that we met in *Kolkey.* Nevertheless, we conclude that petitioner has failed to sustain his burden of proving that the transactions entered into had the real effect of separating equity in the business assets from use of the business assets. Accordingly, we cannot say that Weiser #2 was required to pay these amounts or any

---

[7] Despite the fact that the Weiser #1 sellers were fully paid off in 1953, Russell increased his unsecured loans to Weiser #2 by $108,000 that year and the other sellers also made $100,000 of unsecured loans in 1953. The next year, Russell increased his unsecured loans to Weiser #2 by $128,000. All these debts and the other unsecured loans to related parties set forth in our Findings of Fact, were still outstanding at the end of 1954 and were assumed by Russell's El Toro.

amounts for the use of property in which it has no equity. See *Catherine G. Armston*, 12 T.C. 539 (1949), affd. 188 F. 2d 531 (C.A. 5, 1951); *R.E.L. Finley*, 27 T.C. 413 (1956), affd. 255 F. 2d 128 (C.A. 10, 1958).

In light of this determination, petitioner's persuasive evidence as to a reasonable rental value becomes irrelevant. *Catherine G. Armston, supra.*

On this issue we hold for respondent.

Weiser #2 is not a petitioner in this proceeding—its deficiency has been drawn in question by a transferee, who is liable as such only up to the value of the assets transferred to him. The transfers determined by respondent to be the bases for transferee liability on account of Weiser #2's taxes are the 1955 transfers of El Toro's notes aggregating $181,347.85. If we were to decide in favor of the petitioner the second issue here presented, Weiser #2's total deficiency would nevertheless exceed the total transferee liability. Consequently, our views on that issue cannot affect the decision to be entered in this case. Under such circumstances, and especially since the parties have not discussed the significance for this issue of the findings requested by respondent on the first issue, we will not essay the task of applying the law to a set of formal events whose reality has not been demonstrated.

*Decision will be entered under Rule 50.*