Sterno, Inc. v. Commissioner. Colgate-Palmolive Company, as transferee of assets of Sterno Sales Corporation v. Commissioner.
Sterno, Inc. v. Commissioner
Docket Nos. 580-62, 268-63, 269-63.
United States Tax Court
T.C. Memo 1965-23; 1965 Tax Ct. Memo LEXIS 308; 24 T.C.M. (CCH) 94; T.C.M. (RIA) 65023; February 9, 1965
*308 Sales commission agreement between brother-sister corporations held on the facts to have produced reasonable compensation ( sec. 162(a)(1), I.R.C. 1954) during the years before the Court. Harry L. Brown and Karl W. Windhorst, S. D. Leidesdorf & Co., New York, N. Y., for the petitioners. Joseph Wilkes for the respondent. TRAIN
Memorandum Findings of Fact and Opinion TRAIN, Judge: Respondent determined deficiencies in Federal income taxes of Sterno, Inc., as follows: Docket
Nos.
Year
Amount
580-62
1952
$12,571.95
1953
17,536.36
1954
12,454.45
1955
13,712.19
269-63
1958
14,112.84
1959
16,902.55
1960
13,670.32 Sterno, Inc., claims overpayments for 1952 ($1,823.12) and 1954 ($85.48). Respondent determined a deficiency of $263.69 in Federal income taxes of Sterno Sales Corporation for the period January 1 through October 20, 1960, and notified Colgate-Palmolive Company that it was liable as transferee (Docket No. 268-63) for this deficiency. Colgate-Palmolive Company claims an overpayment of $7,413.05 in Sterno Sales Corporation's taxes for that period. The cases have been consolidated for hearing and decision. Colgate-Palmolive Company concedes that it is the transferee of the assets of Sterno Sales Corporation and *310 further concedes that respondent properly disallowed to the latter corporation a deduction for taxes. The only issues remaining for decision are: (1) Whether Sterno, Inc.'s commission payments to Sterno Sales Corporation constitute unreasonable compensation to the extent they exceed certain of Sterno Sales Corporation's expenses; and (2) If so, whether the amounts determined to be unreasonable constitute taxable income to Sterno Sales Corporation; and (3) If so, whether a transferee is entitled to a determination of an overpayment of tax paid by its transferor. Findings of Fact Many of the facts have been stipulated and are hereby found as stipulated. Petitioner Sterno, Inc., (hereinafter sometimes referred to as "petitioner") was incorporated in New York in 1916 and has its principal office in New York City. It filed its accrual basis Federal income tax returns for 1952 through 1955 and for 1958 with the district director of internal revenue, Upper Manhattan district, New York, and for 1959 and 1960 with the district director of internal revenue, Manhattan district, New York. Sterno Sales Corporation (hereinafter sometimes referred to as "Sales") was incorporated in *311 Delaware in 1926 and had its principal office for the years 1952 through 1960 in New York City. Sales filed its accrual basis Federal income tax returns for 1952 through 1955 and for 1958 with the district director of internal revenue, Upper Manhattan district, New York, and for 1959 and the taxable year January 1, 1960, to October 20, 1960, with the district director of internal revenue, Manhattan district, New York. During the years before us, petitioner and Sales were the wholly owned subsidiaries of Sterno Corporation, a holding company which was incorporated in Maryland in 1920. Petitioner Colgate-Palmolive Company (hereinafter sometimes referred to as "Colgate"), transferee of Sales' assets, is a Delaware corporation with its principal office in New York City. Colgate acquired all the outstanding common stock of Sterno Corporation through an exchange of stock in July 1959. S. D. Leidesdorf and National Distillers & Chemical Corporation owned all the Sterno Corporation outstanding common stock during all the years before us until the Colgate acquisition. Sterno Corporation liquidated Sales on October 20, 1960. Colgate liquidated Sterno Corporation on December 28, 1960, Colgate *312 thereby becoming the direct owner of petitioner's stock. Petitioner is, and for many years has been, engaged in the business of marketing and distributing "Sterno" canned heat and related products. Sales was incorporated to limit multiple state taxing problems confronting petitioner, to limit petitioner's legal liability in connection with salesmen traveling in cars, and to departmentalize and dissociate sales activities from petitioner's general operations. Sales acted as petitioner's sales representative from its incorporation until its liquidation on October 20, 1960. A compensatory sales arrangement between petitioner and Sales existed before 1935, but was never reduced to writing. In 1935, petitioner and Sales entered into a written agreement which recited that it continued the 1934 arrangement and provided for commissions of 12 1/2 percent of sales made by Sales' regular salesmen, plus the actual salaries and expenses of Sales' specialty salesmen. Sales employed specialty salesmen to do "missionary" and promotional work. Small orders taken by specialty salesmen were turned over to the jobbers in their territories who then placed the orders with Sales' regular salesmen. *313 Before 1935, Sales employed as many as several dozen specialty salesmen. During 1935, Sales employed about two or three specialty salesmen. Petitioner and Sales entered into a new agreement in 1936 covering their compensatory sales arrangement for that year. The 1936 agreement recited that it continued the 1935 arrangement and that Sales had agreed to pay petitioner "certain executive salaries and accounting expenses" in consideration of petitioner's performing certain administrative services for Sales. That agreement provided that petitioner would pay to Sales a sale and distribution commission equal to Sales' entire expenses. The 1936 agreement resulted from then current economic conditions. The country was in the midst of a depression. Sales volume for Sterno products had deteriorated by approximately 90 percent. In an effort to bring back volume, Sales decided to confine selling efforts to its regular salesmen. Sales terminated the separate category of specialty salesmen at the beginning of 1936. Petitioner and Sales operated pursuant to the 1936 agreement from 1936 through 1950. Benjamin F. Natkins (hereinafter sometimes referred to as "Natkins") was elected president of *314 petitioner and Sales in April 1951 and served in those positions until December and October 1960, respectively. I. Schur was assistant treasurer of both Sterno Corporation and Sales and was petitioner's auditor during 1951. Petitioner and Sales entered into the following written letter agreement dated December 17, 1951, signed by Natkins, as petitioner's president, and accepted by I. Schur, as Sales' assistant treasurer, on December 18, 1951: This letter is to confirm our oral agreement as at January 1st, 1951, that [petitioner], in consideration of the sale and distribution of its products by [Sales], hereby agrees to reimburse [Sales] for all operating expenses incurred by it during the calendar year 1951 and, in addition, to pay to [Sales] a commission of 1 1/2% of the sales of products of [petitioner] made by [Sales] during the calendar year 1951. Petitioner and Sales continued to operate under the 1951 letter agreement until Sales' liquidation on October 20, 1960. The respective operations of petitioner and Sales did not change in any material degree after 1951 and before Sales' liquidation. Throughout the years before us Natkins was president of Sterno *315 Corporation, petitioner, and Sales. From 1952 through July 1959 (when Colgate acquired Sterno Corporation), A. D. Leisdesdorf was vice president, S. D. Leidesdorf was treasurer, and J. Fraser was secretary of each of the three companies. From July 1959 through 1960 Robert J. Lampe was vice president, Earl N. Felio was treasurer and W. F. Bennett was secretary of each of the three companies. During the years before us, petitioner and Sales occupied the ninth floor of the premises at 9 East 37th Street, New York City. If Sales had operated separately from petitioner, it would have required approximately 25 percent (1,250 square feet) of the entire floor area jointly occupied by the two companies. Petitioner carried on essentially a purchasing and warehousing operation. It developed and designed the "Sterno" line of products, consisting of "canned heat," small collapsible stoves, and equipment for warming and serving food. These items were manufactured by other companies. Petitioner was responsible for assembling many of its products at the warehouse and preparing them for shipment. It advertised its products and conducted numerous trade shows in the major cities of the United States. *316 Petitioner did not engage an independent sales agency to sell the Sterno line during the years involved in this proceeding because of its conclusion that the specialized type of selling services required by it could not have been provided by an agency handling the products of many manufacturers as effectively as those services were actually provided by Sales. The Sterno products sold by Sales through its employees during the years involved in this proceeding are listed in order blanks and price lists and are pictorially described in catalogues. The order blanks are in Sales' name and the price lists and catalogues bear petitioner's name. Sales had at least eight employees, including a sales manager, during 1951, and approximately the same number for all subsequent years until its liquidation in 1960. Sales' sales manager was named Goldklang. He had been with Sales since about 1928. During the years before us, he was employed only by Sales. Goldklang supervised the salesmen, assigned their territories, suggested accounts, made constructive criticism of their work, reviewed their daily reports, and trained new salesmen. He corresponded with Sales' important accounts. He frequently *317 discussed all his activities, including general sales policies, with Natkins. He was in New York City approximately six months of each year - January, June through September, and December. He spent the balance of the year in the field selling and assisting other salesmen. Goldklang was responsible to Natkins, in the latter's capacity as Sales' president. Natkins divided his time between petitioner and Sales. When Goldklang was in the New York City office, Natkins devoted approximately 20 percent of his time to Sales. Natkins' time was required for discussions with Goldklang relating to salesmen, sales policies and accounts; review of correspondence and reports; and general supervisory work. When Goldklang was in the field, Natkins devoted approximately 30 to 35 percent of his time to Sales. Goldklang's absence from the office required Natkins to assume additional administrative duties in connection with directing the work of the salesmen. Natkins was responsible for hiring the salesmen. Natkins devoted the major part of his time to petitioner. His duties related to financial matters, purchasing, developing equipment, newspaper advertising, trade publications advertising, and trade *318 shows. There is no basic standard rate of commission in an industry for selling a particular product. The rate is fixed primarily as a result of bargaining or negotiation, and generally depends upon the amount of effort required to sell a particular product. The factors taken into consideration in fixing the commission rate include the type of product, the type of programming and advertising carried on by the manufacturer, the consumer acceptance of the product, the existing volume of sales, and the potential volume of sales. The products sold by petitioner can be divided into two classes, regular sales and institutional users' division sales. The regular sales consist principally of a small, portable, individual stove together with the canned heat to be used with it. The stove once sold at retail from $.50 to $1.50 and the canned heat sold at wholesale at $11 per gross for the small size and $28 per gross for the large size. The stoves now sell at $.98 for the small stove and $1.49 for the two-burner stove. The institutional sales consisted of sales of equipment, ranging in price up to *319 $945 for a "Duo Wagon," together with the canned heat to be used with such equipment. Institutional sales were made to hotels, clubs, restaurants, and caterers. Institutional selling requires more effort by the salesmen and, accordingly, is more costly than consumer selling. The sales effort required to sell the entire line of Sterno products was no greater in 1952 through 1960 than it was in 1951. An analysis of the sales made by Sales and reported on petitioner's Federal income tax returns discloses the following: Institu-
Regular
tional
Year
Sales
Sales
Totals
1952
$576,267
$ 814.014
$1,390,281
1953
564,743
892,960
1,457,703
1954
714,525
988,295
1,702,820
1955
774,454
1,090,518
1,864,972
1958
854,001
1,068,953
1,922,954
1959
894,366
1,135,901
2,030,267
1960
751,607
960,456
1,712,063
Petitioner paid or accrued (and claimed a deduction for) commissions to Sales for each of the years involved in this proceeding as follows (amounts rounded to nearest dollar): 1 1/2%
Total
Com-
Com-
mis-
Reimbursed
mis-
Year
sion
Expenses
sions
1952
$21,054
$107,461
$128,515
1953
21,938
106,927
128,865
1954
25,544
117,410
142,954
1955
27,908
124,312
152,220
1958
28,658
117,613
146,271
1959
29,887
123,870
153,757
1-1 to 10-20-60
26,123
142,392
168,515
*320 For each of the years involved in this proceeding, Sales paid (and was reimbursed) only for salesmen's salaries and expenses, state and local taxes, and minor general expense items. All other expenses (officers' salaries, rent, advertising, and virtually all general administrative expenses) were paid directly by petitioner. In determining the deficiencies against petitioner, respondent disallowed as a deduction the amount of commission payable to Sales in excess of Sales' operating expenses as adjusted by the revenue agent. % Al-
Year
Disallowed
Allowed
lowed
1952
$19,166.69
$109,348.71
85.1
1953
20,710.50
108,154.71
83.9
1954
24,198.21
118,755.56
83.1
1955
26,410.82
125,809.64
82.6
1958
27,084.73
119,186.30
81.5
1959
28,122.72
125,634.76
81.7
1960
25,339.89
143,174.72
85.0
In January 1961, following the liquidation of Sales, petitioner engaged Gloeckler Sales, Inc., (hereinafter sometimes referred to as "Gloeckler") as its sales representative. Gloeckler represents petitioner in 21 states with respect to Sterno canned heat and portable cooking stoves. All sales of Sterno products by Gloeckler are made at the consumer *321 level. Petitioner pays commissions at a rate of 10 percent on all sales made by Gloeckler. This rate was agreed to by Gloeckler because, as selling agent for petitioner, there was a possibility of extending its representation to the products of Colgate. Gloeckler would not have sold Sterno canned heat to institutions, unless the commission rate exceeded 10 percent. Gloeckler is an independent sales organization with a 1963 sales volume of approximately $17,500,000. It represents approximately 18 manufacturing or distributing companies in 21 states. It sells to retail, wholesale, and chain store outlets in the drug, food, and variety field. Gloeckler owns no physical assets except furniture and fixtures consisting of typewriters, adding machines, desks and chairs. Its sales activities involve the utilization of 2,200 square feet of office area. Glockler employs 32 salesmen, a controller (who also acts as office manager), a secretary-receptionist, and a sales correspondent (who also acts as an order clerk). Gloeckler does not bear or incur expenses for advertising, displaying, warehousing or shipping the various products sold by it. It has no sample costs or customer credit checking *322 costs. Its salesmen attend trade shows but their expenses are borne by the manufacturing companies which conduct the shows. R. K. Batchelder (hereinafter sometimes referred to as "Batchelder") was an independent sales agent in Chicago, Illinois. He handled a limited line of products, which he sold to railroad and trucking companies which transported perishable goods. His principal wares were insulation material and charcoal heaters which were used by his customers in their refrigerator cars. The only Sterno product handled by Batchelder was the fuel which he sold as an igniter for the charcoal heater. Pursuant to an oral agreement, petitioner, during 1951, paid Batchelder a commission of 7 1/2 percent on all sales of Sterno fuel made by him. The same commission rate was paid by petitioner with respect to similar sales made by Batchelder during 1952 through 1960. The commission rate before 1951 had been 10 percent. Batchelder accepted a reduction from 10 to 7 1/2 percent in view of an oral agreement reached with petitioner that prices would not be increased because of rising costs. For each of the years before us, petitioner incurred and paid commissions to Batchelder with respect *323 to sales made by him in the following amounts: Year
Commissions
Sales
1952
$1,567.17
$20,895.60
1953
949.76
12,663.47
1954
819.52
10,926.93
1955
862.01
11,493.47
1958
1,151.61
15,354.80
1959
2,204.30
29,390.67
1-1 thru 10-31-60
2,652.67
35,368.93
Sterno of Canada, Ltd., is a wholly owned subsidiary of Sterno Corporation. Sterno of Canada, Ltd., marketed and distributed the entire line of Sterno products in Canada in the same manner as petitioner did in the United States. Since the incorporation of Sterno of Canada, Ltd., in 1920, Harold F. Ritchie & Company, Ltd., (hereinafter sometimes referred to as "Ritchie") has been its sales agent. Ritchie is wholly unrelated to any of the Sterno companies and sells many items other than the Sterno line. Ritchie sells Sterno products principally in Montreal, Toronto, Hamilton, Quebec, Winnipeg, and Vancouver. The compensatory sales arrangement between Sterno of Canada, Ltd., and Ritchie was governed by an oral agreement at all times. For 1951, the commission rate was 11 percent on the American price plus 2 1/2 percent on the Canadian price. The Canadian price was, in substance, the American price *324 price the cost of freight and duty required to be paid upon goods brought into Canada. The 2 1/2 percent commission was to compensate the Canadian selling agent for handling and delivery costs. The 1951 commission rate was continued in effect by Sterno of Canada, Ltd., during 1952 through 1960. The commission rate for years prior to 1950 had been 12 1/2 percent of the American selling price plus 4 percent of the Canadian price. Ritchie accepted the reduction in commission rate in view of an oral agreement reached with Sterno of Canada, Ltd., that the selling prices would not be increased because of rising costs. Petitioner's payments to Sales for the years before us consitute reasonable compensation for the services rendered by Sales. Opinion Respondent maintains that to the extent set forth in the deficiency notices, petitioner's commission payments constitute unreasonable compensation within the meaning of section 162(a)(1). [1] Petitioner maintains that the payments constitute reasonable compensation and are fully deductible. Petitioner also argues that respondent's determination is arbitrary and unreasonable since it is based solely upon Sales' net income. Respondent replies *325 that his determination is not arbitrary. We agree with petitioner that its sales commission payments constitute reasonable compensation. Petitioner's accountant testified as to the amounts of petitioner's expenditures he determined to be fairly allocable to Sales for each of the years before us. Comparison of these amounts, the commissions actually paid, the total commissions thus "reconstituted," sales, and "reconstituted commissions" as a percentage of sales, reveals: "Allocated
Commissions
"Reconstituted
Years
Expenses"
Paid
Commissions"
Sales
Percent
1952
$ 36,373
$ 128,515
$ 164,888
$ 1,390,281
11.86
1953
34,784
128,865
163,649
1,457,703
11.23
1954
39,414
142,954
182,368
1,702,820
10.71
1955
40,128
152,220
192,348
1,864,972
10.31
1958
47,022
146,271
193,293
1,922,954
10.05
1959
47,964
153,757
201,721
2,030,267
9.94
1-1 to 10-20-60
38,375
168,515
206,890
1,712,063
12.08
$284,060
$1,021,097
$1,305,157
$12,081,060
10.80
*326 Respondent's only objection to this testimony is that major elements of "allocated expenses" - to wit, executive salaries and rent - are too high. To the extent respondent's objection is well taken it would reduce the rate of the "real" commissions below the 9.94-12.08 percent range suggested by petitioner. Petitioner has presented evidence that unrelated sales representatives dealt with by petitioner and by a similar wholly-owned subsidiary of petitioner's parent charged commissions ranging from 7 1/2 to 13 1/2 percent. The evidence indicates that Sales' job was at least as difficult and valuable (in terms of factors affecting rates demanded by unrelated sales representatives) as the selling jobs performed by others for petitioner and Sterno of Canada, Ltd. We do not know what circumstances induced respondent to conclude that the commissions paid were unreasonable compensation but that approximately five-sixths of those amounts were reasonable. However that may be, respondent's determination must be deemed prima facie correct and petitioner is charged with the burden of establishing that *327 the commissions paid were reasonable compensation for the services performed by Sales. Shield Co., 2 T.C. 763, 769-770 (1943). On the basis of the record as a whole, we conclude that petitioner has adequately demonstrated that the commission payments were reasonable. This is to be contrasted with the situation when the Commissioner proceeds under section 482. [2] In such a case, the taxpayer has the burden of showing not only that its action was reasonable, but also that the Commissioner's determination was arbitrary and unreasonable. Nat Harrison Associates, Inc., 42 T.C. 601, 621 (1964); Grenada Industries, Inc., 17 T.C. 231, 255 (1951), affd. 202 F. 2d 873 (C.A. 5, 1953); National Securities Corporation, 46 B.T.A. 562, 565 (1942), affd. 137 F. 2d 600, 602 (C.A. 3, 1943). In the case before us, respondent specifically disclaims reliance upon section 482. *328 Respondent relies upon Sterno, Inc., a Memorandum Opinion of this Court, affd. per curiam 286 F. 2d 548 (C.A. 2, 1961), in which we upheld his determination that petitioner's 1951 commission payments were excessive to the extent of Sales' net income for that year. We decided that case on the basis of the burden of proof and not because the evidence established the payments to be excessive. Respondent does not contend that our decision in that case collaterally estops petitioner from disputing his determinations for the years now before us. Respondent does, however, stress the fact that a shift of income from petitioner (taxed at 52 percent) to Sales (taxed in part at 30 percent) would accomplish net tax savings of some $36,000 during the seven years before us. But respondent does not challenge Sales' separate existence. The mere fact that Sterno Corporation could have accomplished some, if not all, of its business purposes by using one subsidiary rather than two does not by itself justify taxing Sales' profits to petitioner.[3] See Seminole Flavor Co., 4 T.C. 1215, 1229, 1235 (1945). Our concern must be with whether petitioner has demonstrated that its *329 payments to Sales constituted reasonable compensation for the services Sales performed for petitioner. Respondent contends that our earlier decision validated his method of determining the extent of petitioner's unreasonable compensation payments; i.e., disallowing a deduction for payments in excess of Sales' net income. In the earlier case we concluded that the record did not support a finding "that the services rendered for petitioner by or in the name of [Sales] were anything more than the services of the salesmen themselves or were reasonably worth more than the salary, commissions and expenses received by them." We stated that "[according] to Natkins, president of both petitioner and [Sales], there was a sales manager, but there is no indication that he worked for or was employed by [Sales], or that his services as sales manager were substantial." We also concluded that the evidence as to commissions paid to Batchelder and to Ritchie were insufficient to lead us to a finding since it was not clear that their functions were comparable to those performed by Sales. Our earlier decision, based as it was upon *330 gaps in the taxpayer's proof, cannot fairly be said to constitute a validation of respondent's method. Burford-Toothaker Tractor Co. v. Commissioner, 192 F. 2d 633, 634 (C.A. 5, 1951), affirming a Memorandum Opinion of this Court. The evidence introduced here details the extensive supervisory activities of the sales manager, Goldklang, and clearly indicates that those activities were performed in his capacity as Sales' employee. Respondent has not objected to petitioner's proposed findings regarding Goldklang and we conclude that those findings are clearly warranted by the record. The evidence introduced regarding Gloeckler indicates (1) that a business such as that conducted by Sales and Gloeckler requires little in the way of capital assets or space and (2) that the rates charged by this independent agency and actually paid by petitioner for the less expensive part of Sales' services are comparable to the rates charged by Sales. As we have noted, the earlier case was decided on the basis of the burden of proof, because the petitioner failed to introduce sufficient evidence. Here, as elsewhere, the addition or change of a few factors may suffice to give a different *331 cast to the entire picture presented by the record. Compare Warren Brekke, 40 T.C. 789 (1963), on appeal C.A. 9, March 24, 1964; Gordon MacRae, 34 T.C. 20 (1960), affd., 294 F. 2d 56 (C.A. 9, 1961); and Glenshaw Glass Co., 13 T.C. 296 (1949), with Royal Farms Dairy Co., 40 T.C. 172 (1963), on appeal C.A. 9, October 1, 1963; L. Lee Stanton, 34 T.C. 1 (1960); and Glenshaw Glass Co. v. Commissioner, 175 F. 2d 776 (C.A. 3, 1947), affirming a Memorandum Opinion of this Court dated October 15, 1946. On this issue we hold for petitioner. Colgate, transferee of Sales, has argued that if we should hold for the respondent on the first issue, we must find an overpayment by Sales. Since we have decided the first issue in petitioner's favor, we hold that Sales properly included in income the entire amounts paid to it by petitioner and sustain respondent on the second issue. Because of our decision on the above issues, we need not decide the third issue. Decisions will be entered under Rule 50. Footnotes
1. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954. SEC. 162. TRADE OR BUSINESS EXPENSES. (a) In General. - There shall be allowed as a deduction all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business, including - (1) a reasonable allowance for salaries or other compensation for personal services actually rendered; This provision substantially re-enacts section 23(a)(1)(A) of the Internal Revenue Code of 1939↩, which controls the two earliest years before us in this case.
2. SEC. 482. ALLOCATION OF INCOME AND DEDUCTIONS AMONG TAXPAYERS. In any case of two or more organizations, trades, or businesses (whether or not incorporated, whether or not organized in the United States, and whether or not affiliated) owned or controlled directly or indirectly by the same interests, the Secretary or his delegate may distribute, apportion, or allocate gross income, deductions, credits, or allowances between or among such organizations, trades, or businesses, if he determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses.↩
3. Respondent does not rely on sections 269 or 1551.↩